## BRAUN v. WIEGAND.

(Court of Appeals of District of Columbia. Submitted November 18, 1919. Decided January 5, 1920.)

### No. 1271.

1. PATENTS ⊜91(4)—JUNIOR PARTY MUST ESTABLISH PRIORITY BEYOND REASONABLE DOUBT.

In patent interference cases, where a patent has issued to the senior party before the junior party files his application, the junior party must establish that he is the inventor beyond reasonable doubt.

2. PATENTS ⊜91(4)—PRIORITY OF SENIOR PARTY, EXCEPT AS TO ONE CLAIM, SUSTAINED BY EVIDENCE.

Evidence in a patent interference proceeding, involving an improved electrical system for wiring in heating devices, regarding the activities of the rival parties, who had worked for the same concern, that the junior party delayed filing his application until nine months after the senior party's patent issued, and for two years after he claimed to have made a disclosure of the device, etc., *held* to establish that the senior party was entitled to priority, except as to one claim.

Appeal from a Decision by the Assistant Commissioner of Patents.

Patent interference proceeding between Edwin L. Wiegand and William A. Braun. From a decision of the Assistant Commissioner of Patents, awarding priority to the senior party, Braun appeals. Affirmed, as modified.

Harry Frease, of Canton, Ohio, and L. C. Wheeler, of Milwaukee, Wis., for appellant.

John B. Hull and Harold E. Smith, both of Cleveland, Ohio, for appellee.

SMYTH, Chief Justice. Braun appeals from a decision of the Assistant Commissioner of Patents awarding priority to Wiegand in an interference concerning the invention of an apparatus for embedding an electric resistance wire in the insulating portion of heating devices, such as the electric sadiron. There are 14 counts, illustrated sufficiently by counts 1, 5, 6, and 9:

1. In an apparatus of the character described, the combination of a base support, a supporting device for a conductor, means for moving said device toward and from the base, and means adapted to remove the conductor from its supporting device and apply it to the base.

5. As a means for applying a conductor to a suitable base, the combination of a plurality of pins whereto the conductor is applied, and means co-operating with the conductor to remove the same from the pins.

⊜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

6. As a means for applying a conductor to a suitable base, the combination of a support for a conductor, and means co-operating with the conductor to remove the same from the support.

9. In an apparatus of the character described, the combination of a base support, a base plate having a plurality of pins projecting therefrom on the ends of which the conductor is wound, a stripping plate mounted on the pins and interposed between the conductor and the base plate, means for moving said base plate toward the base support, and means for moving the stripping plate relatively to the base plate to remove the conductor from the projecting ends of the pins.          .

[1] Both parties claim the invention and rely upon the same reduction to practice, which was accomplished in the shops of their employer, the Dover Manufacturing Company, Dover, Ohio. The problem to be solved, therefore, is one of originality. Wiegand was granted a patent for the invention March 30, 1915, on an application filed January 9, 1914. Braun did not apply for a patent until January 19, 1916. In order, therefore, that Braun may succeed, he must establish beyond a reasonable doubt that he is the inventor. Sharer v. McHenry, 19 App. D. C. 158; Dashiell v. Tasker, 21 App. D. C. 64; Sendelbach v. Gillette, 22 App. D. C. 168; Schmidt v. Clark, 32 App. D. C. 291.

[2] Braun is an electrical engineer, and entered the employ of the Dover Manufacturing Company in April, 1911, and, for aught that appears, is still there. His first work for that company was to design a sadiron embodying an automatic control, for which he had previously secured a patent. This proved so unsatisfactory that the officers of the company became convinced that the iron would have to be improved or its manufacture discontinued.

Wiegand, a young man, became an employé of the same company in June, 1911. He had taken a course in electrical engineering, and, with his brother, had equipped a shop at his home, where he made various electrical devices, such as motors, batteries, etc. In January, 1912, he was assigned to the work of assembling and testing the irons which the company was manufacturing. After awhile he became foreman of the electric flatiron department, and was regarded as an expert in that line.

Braun assigned his application to his employer. Nearly all his witnesses are officers of that company, while Wiegand depends on the testimony of himself, his brothers, and a friend. The evidence is very conflicting; nearly every material statement made by the one side is denied by the other. We must, therefore, test its accuracy by the circumstances surrounding the parties, as well as by things which were done or omitted to be done by them, and about which there is no controversy.

An important consideration in this connection is the fact that the sadirons which the company was manufacturing were totally unsatisfactory, and consequently that it was very anxious to discover an iron which would meet the requirements of the trade. Keeping this in mind, we find that Braun's preliminary statement asserts conception in October, 1911, and disclosure about January 15, 1912. Haug, the general superintendent of the company, testified that in the early part of December, 1911, after the president of the company had strongly ex-

pressed to Braun his dissatisfaction with the latter's first invention, Braun came into the office where Haug was, made sketches, and explained in detail the complete machine of the issue. Yet that machine was not constructed until the latter part of 1912. It appears, also, that before the device disclosed by Braun, according to Haug, was developed, Braun spent several months working on a less satisfactory form, but finally returned to the form first conceived. If Haug's recollection as to the time of the disclosure be correct, why the delay in preparing the structure for the market? Especially pertinent is this inquiry in view of the earnest desire of the company to discover an acceptable device. The trade was waiting for it; the company had it, according to Haug, and yet neglected to construct it and put it on sale. It is claimed on behalf of Braun that there are a number of witnesses who testified that he commenced work upon the machine of the issue in January, 1912; but we do not think their testimony supports the claim. It relates to what is known as the groove type of winding form, which was operated by hand for a little while, and not to the pin type of winding form, which is the invention in controversy.

Wiegand gave much attention to experimental work. Besides the patent in controversy, he had obtained two other patents. It is admitted that he made the working drawings for the machine of the issue. He claims that they were made at his home, while Braun insists that they were made at the factory, under the latter's directions. Wiegand is supported by the testimony of his brother, who says that the drawings were made at his home at night. Another brother testifies that in January, 1912, Wiegand told him that he had a machine figured out which "would bring this wire down, put it in the bottom all at once, something in this style," and illustrated it by bringing his right hand down into his left hand. Wiegand filed his application in January, 1914, and left the company in the summer of that year. This shows that Wiegand had a conception of the invention of the issue before Braun, unless the latter has established beyond a reasonable doubt that he conceived it in 1911 and disclosed it in January, 1912. But he has not done so.

In addition to this it must not be overlooked, because it is in our judgment of much importance, that Braun did not apply for a patent until nine months after Wiegand's patent had issued, and not until over three years after the invention patented by Wiegand was to a large extent in commercial use. Braun knew that Wiegand had applied for a patent and that he had received one; nevertheless he, though he had been seeking earnestly the device of the issue, made no objection whatever at the time. Not only that, but he permitted more than two years to elapse between the date on which he claims to have made a disclosure of the device, and the time of his application for a patent thereon, thus allowing the bar of public use to run against any right that he might otherwise have to a patent. This in itself constitutes strong evidence against him. Sendelbach v. Gillette, 22 App. D. C. 168, 180. All these things, when considered, convince us that, as to all the claims, except No. 6, Braun has not established beyond a reasonable doubt that he is entitled to them.

But with respect to claim 6 we think that he has clearly proven by the required quantum of evidence that the device on which it reads was made and used in January, 1912, prior to the date of conception claimed by Wiegand. There is no limit in it to the pin type of winding form, nor is there any limitation to an organized machine for supporting the form and bringing it down to the base whereon the plastic material is supported. It calls particularly for a means of applying a conductor to a suitable base, including or comprising a support for the conductor, which may be the grooved winding form of Braun's Exhibit 13, and means co-operating with the conductor to remove the same from the support which in Braun's Exhibit 13 may be the movable spider with which the form is provided, and therefore we think that Braun is entitled to this claim.

The decision of the Assistant Commissioner of Patents is affirmed, with respect to all the claims excepting claim 6, and as to it priority of invention is awarded to Braun.

Modified.