### PECK v. STANDARD PARTS CO.

(Circuit Court of Appeals, Sixth Circuit. July 21, 1922.)

No. 3640.

1. **Master and servant** ⬅➡62—Under general employment to devise improvements, invention and patent belong to employee, and employer has license.

Under a general contract of employment, requiring the employee to devise such improvements as he can in the employer's machines, processes, or product, any patentable invention belongs generally to the employee, while the employer has a license to use it, the extent of which depends on the facts.

2. **Master and servant** ⬅➡62—Express contract, giving employee's inventions and patents to employer, is valid and enforceable.

An express contract, appearing with sufficient certainty and reasonably limited to the subject-matter, giving the inventions and patents developed by an employee at the employer's expense to the employer, is valid and enforceable.

3. **Master and servant** ⬅➡62—Invention belongs to employee, though contract is to devise or improve specific thing.

The rule that patentable improvements invented by an employee on the time and at the expense of the employer belong to the employee, and

---

⬅➡For other cases see same topic & KEY-NUMBER in 'all Key-Numbered Digests & Indexes

that the employer has only a license for their use, applies, though the employment was to devise or improve a specific thing, especially where the invention as made and patented extends beyond the field of the employer's business.

**4. Patents ⟨⟩183—Statute as to right to use and sell machines constructed before application for patent held applicable.**

Rev. St. § 4899 (Comp. St. § 9445), providing that every person purchasing of an inventor or discoverer, or with his knowledge and consent constructing any patentable article prior to the application for a patent, shall have a right to use and vend the specific thing so made or purchased, applied to machines constructed by plaintiff for one employing him to develop new machinery, and which had been in process of construction for months before the patent application was made, and the employer had a right to sell such machines.

**5. Patents ⟨⟩213—Machines constructed by patentee for another could be sold by it.**

Aside from Rev. St. § 4899 (Comp. St. § 9445), machines constructed by a patentee for one employing him to develop new machinery with its material and labor, and with satisfactory compensation to him for his supervision, could be sold by the employer.

**6. Patents ⟨⟩213—License to inventor's employer does not pass on sale of employer's business.**

The license to construct a patentable invention, resulting from the fact that the invention was devised by the patentee while in the licensee's employment and at its expense, is not assignable, and does not pass by an ordinary sale of the employer's business.

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Ohio; D. C. Westenhaver, Judge.

Suit for infringement of patent by William J. Peck against the Standard Parts Company. From a decree for defendant, plaintiff appeals. Reversed and remanded.

Chas. L. Byron, of Chicago, Ill. (William J. Peck, of Peoria, Ill., and George L. Wilkinson, of Chicago, Ill., on the brief), for appellant.

Bert M. Kent, of Cleveland, Ohio (Tolles, Hogsett, Ginn & Morley, of Cleveland, Ohio, on the brief), for appellee.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

DENISON, Circuit Judge. The Hess Pontiac Spring & Axle Company (hereafter called the Pontiac Company, or the employer) was engaged in manufacturing springs for the Ford automobile, and desired automatic machinery for such manufacture. Having already acquaintance and some business relations with Wm. J. Peck, of Peoria, Ill., who was a designer of machinery and a solicitor of patents, and a lawyer practicing in patent cases, the Pontiac Company, as first party, entered into a written contract with Peck, as second party, which was signed August, 1915, and the body of which is as follows:

"This agreement witnesseth: That second party is to devote his time to the development of a process and machinery for the production of the front spring now used on the product of the Ford Motor Company. First party is to pay second party for such services the sum of $300 per month. That should said process and machinery be finished at or before the expiration of four months from August 11, 1915, second party is to receive a bonus of $100 a

---

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

month. That when finished second party is to receive a bonus of $10 for each per cent. of reduction from present direct labor, as disclosed by the books of first party."

Peck proceeded under the contract, and eventually developed, and there were manufactured, a series of machines which produced these springs to the satisfaction of the Pontiac Company. One of the series, known as No. 9, completed the forming of a spring leaf and gave it an oil bath. The compensation provided by the contract was paid. Later the Pontiac Company, with Peck's active participation, manufactured and put into production five more of the No. 9 machines. Still later, the Standard Parts Company took over all the property and business of the Pontiac Company and became its commercial successor. It proceeded to build and install four more of the No. 9. In the meantime Peck had been negotiating with the Pontiac Company and its successor for a permanent contract for his expert services, and had obtained a patent upon this particular machine; this patent being No. 1,249,473, issued December 11, 1917, to him upon a "forming and quenching machine."

The negotiations for a satisfactory general contract failed, and thereupon Peck brought this action in the court below. It was in the usual form of an infringement bill. The defendant answered, relying wholly upon its rights under the contract of August, 1915, by virtue of which it claimed equitable title to the patent in suit; and the answer proceeded, in the nature of a cross-bill, to set up the facts more fully, and to ask a decree that the plaintiff be compelled to convey to it the legal title. After a hearing upon proofs duly taken, the court fully sustained the defendant's position, and made a decree directing that the bill be dismissed, and that the patent be conveyed to defendant, as prayed by the cross-bill.

[1, 2] The primary question in the case is as to the legal effect of the contract. In its discussion it is to be taken as the starting point that where an employee, under merely a general contract obligation to devise such improvements as he can in the employer's machines, processes, or product, makes such an improvement, developing it upon the time and at the expense of his employer, and the improvement involves a patentable invention, the invention and patent belong generally to the employee, while the employer has a license, the extent of which depends upon the facts of the case. Hapgood v. Hewitt, 119 U. S. 226, 7 Sup. Ct. 193, 30 L. Ed. 369. It is equally clear that where there is an express contract, appearing with sufficient certainty and reasonably limited to the subject-matter, giving such inventions and patents to the employer, it is valid and will be specifically enforced. Mississippi Co. v. Franzen (C. C. A. 3) 143 Fed. 501, 74 C. C. A. 135, 6 Ann. Cas. 707.

[3] The question now for determination is whether there is an exception to the universality of the first rule, by which, though in the absence of any express contract or distinct understanding that the patent shall belong to the employer, that result will follow as a matter of law from some particular contracts of employment. The supposed exception was formulated by Mr. Justice Brown in Gill v. United

States, 160 U. S. 426, when he said on page 435, 16 Sup. Ct. 322, on page 326 (40 L. Ed. 480), after stating the general rule that ordinarily the inventions and patents of the employee for improvements in the machine with which he is connected belong to him:

"On the other hand, it is equally clear that, if the patentee be employed to invent or devise such improvements, his patents obtained therefor belong to his employer, since in making such improvements he is merely doing what he was hired to do."

If this is to be taken as an accurate statement of the existing rule of law, it applies to the situation here involved and justifies the decree below. Whether it should be so accepted is a question of great general importance, which has received careful consideration in only one reported case, and which we think justifies a full discussion.

In the dearth of actual authority, the situation invites thought as to the underlying principles and reasons. If one is hired in a general supervising or advisory capacity—as was Hewitt in the Hapgood Case—and it is expressly understood that he is to devote his talents and skill to making improvements, and if, in the course of developing such improvements, he makes a patentable invention therein, there would be strong ethical grounds for saying that the invention belonged to the employer, just as did the other fruits of the labor and skill which had been bought and paid for; but the contrary view has prevailed, and has become the settled law. The approved principle—although it is not fully developed in the Hapgood Case—perhaps is that such a contract commonly contemplates, and is fully satisfied by, that body of devices and improvements and betterments which are the product of mere skill; that all these things the employer indisputably obtains for the benefit of his business, and they justify the price which he has agreed to pay; that for the employee to go beyond such skill and make a patentable invention is the unusual and abnormal thing; and that for the employer to get, not only the benefit of the improvements in his business, but to get also a monopoly whereby all others can be excluded for a period of years, is also a thing not normally to be anticipated, and particularly is this so when the patent extends, as it often or usually will, to a monopoly reaching into many other lines of business, and just as far as the patented device could be usable. In this view there is satisfactory reason for saying that, if the entire invention and all its possible exploitation are to be taken away from its primary owner and transferred to the employer, that result ought to be expressed in the clearest and plainest words, and ought not to be left to uncertain implications from duties and conduct.

We think that this idea, substantially as thus stated, is the foundation principle of the whole inquiry. It does not follow that, because the employer does not get everything, he gets nothing. The existence of the license which the courts have declared in this situation is only the result of determining the intent of the parties from their relations and conduct, whether it be based on the doctrine of implied contract, following out the real intent, or on that of estoppel.

Further inquiring as to matters of the principle involved: Is there

any reason why a contract to devise one specific improvement should be made an exception to the rule which is applied to contracts to devise improvements of a specific class? In other words, while we recognize the general rule that Hewitt, employed to devise and make improvements in the plows manufactured by the Hapgood Company, became the owner of an invention which he made in such plows, and with only a license to the employer, is there any logical basis for saying that Clark (in the Solomons Case, infra), whose duty was to devise a self-canceling stamp and who made an invention therein, took nothing under his invention, but the employer took the whole title, instead of a license? We have not found, in any of the cases, any reason suggested for such a distinction; nor do we observe any. Surely the reason that the fruits of the inventive skill have been bought and paid for, if it were a good reason, would deny the general rule as well as support the exception. Nor can any theory of estoppel uphold the exception, as distinct from the rule. Ordinarily, every equity in the employer created by estoppel will be completely satisfied by a license; and, if estoppel could lead to a right to have the patent conveyed to the employer, that result would follow as well in contracts of general employment as with contracts to devise a particular thing. Indeed, after examining, as we think, every reported federal case on the subject, we find only two in which the principles of estoppel are, or may be, relied upon to support a decree giving title to the employer; and in both of those the employment was general, not specific. National Co. v. Healy (C. C. A. 7) 189 Fed. 49, 110 C. C. 613; Dowse v. Federal Co. (D. C.) 254 Fed. 308, 316.

Nor can we think that the exception commends itself as so inherently reasonable as to require adoption. It can be illustrated by application to familiar cases. If a farm laborer had been employed specifically to build a wire fence which would keep cattle out, and had hit upon the successful method of attaching a barb, ought the employing farmer to have been entitled to the barbed wire patent? If the superintendent of a mining company's stamp mill had been directed to put his energies on finding a better plan of concentration to use in the company's work, and had hit upon the flotation process, should the mining company be entitled to the patent? Nor is there any hardship to the employer in denying that a contract to devise a particular improvement conveys title to any resulting invention. If that is the intent, it is easy to say so.

Another thing is obvious. If the exception exists, there would be great difficulty, if not practical impossibility, in drawing a line between the rule and the exception. If there are five articles in the employer's line of manufacture, and an agreement to try to improve all of them does not carry title to the resulting patent (the general rule of the Hapgood Case), while an agreement to try to improve one of them does carry such title (the supposed exception), what would be the law about an agreement to try to improve three of them?

Since we are bound to accept as logically sound, the general rule that a contract to make improvements does not carry the whole patent, and since we find no logical basis for the alleged exception, and great prac-

tical difficulty in its application, it must follow that we cannot approve the exception, unless there is compelling authority to that effect. There is no such authority, unless it be found in what is said by Justice Brewer in the Solomons Case, infra, and Justice Brown in the Gill Case, supra. These statements can best be considered in connection with a review of the entire field in which the Supreme Court has touched the subject.

In McClurg v. Kingsland, 1 How. 202, 11 L. Ed. 102, Harley was employed at a foundry, receiving weekly wages. While so employed he devised the improvement, which was in effect a process, and it was used in the foundry successfully for several months with his participation. He proposed that a patent should be taken out and that the employer should buy it. The proposition was declined. He did not demand compensation for the use, or give notice not to use it, until he left the employment. The only holding was that Harley could not recover against his former employer for infringement of the patent, because the existence of a license or grant from Harley might be presumed.

In Hapgood v. Hewitt, Judge Gresham, in the Circuit Court (11 Fed. 422), had held that there had been only a license, and that, being nonassignable, it had not passed to the defendant. The Supreme Court affirmed. 119 U. S. 226, 7 Sup. Ct. 193, 30 L. Ed. 369. The opinion was in 1886 and was by Justice Blatchford. It appeared that Hewitt was expressly employed, not only as superintendent, "but also [to] devote his time and service to devising improvements in getting up and perfecting plows adapted to the general trade of the [employer]." He agreed to "use his best efforts and devote his knowledge and skill to devising and making such improvements in getting up and perfecting plows and other improvements adapted to the trade." During this employment he made the invention in question. It was held that title to the invention had not passed to the employer. Construing the contract, as it has been recited, Justice Blatchford said that it contained nothing—

"as to any agreement between the corporation and Hewitt that the former was to have the title to his inventions or to any patent that he might obtain for them. * * * It is not averred that anything passed between the parties as to a patent. We are not referred to any case which sustains the view that on such facts * * * the title to the invention or to a patent for it passed."

The suggested exception to the general rule, viz. that the title will pass if the employment is to devise a specific thing, was not mentioned by Justice Blatchford, but seems to have been fully presented by the facts of the case, and to be covered by the decision. It appears (119 U. S. 230, 7 Sup. Ct. 193, 30 L. Ed. 369) that not only was there the general employment with the general duties, but that the company had thought advisable to change the form from a wooden sulky to an iron sulky, and that the president expressly directed Hewitt to proceed to devise and build an iron sulky plow in accordance with the directions which had been given to him, and that, after some difficulty and pursuant to the general instructions, he succeeded in making an iron sulky plow satisfactory to the president, and it was for

the features of this iron sulky that he secured the patent. It is not easy to see how employment to devise a particular thing can be more specific that Hewitt's was, and it seems plain enough that Justice Blatchford did not know of the exception now alleged. This necessary aspect of the decision is to be remembered in observing the later cases.

In Solomons v. United States, 137 U. S. 342, 11 Sup. Ct. 88, 34 L. Ed. 667, Justice Brewer wrote the opinion. Clark was an employee of the government. The Secretary of the Treasury, in connection with internal revenue taxes, desired to adopt the best methods, and Mr. Clark was called into consultation and assigned the duty of devising an internal revenue stamp of the most useful form which he could make up. He did devise a self-canceling stamp, reported it back to the treasury, and it was adopted. Later, he obtained a patent upon it, and brought infringement suit against the United States. The only thing involved in the case was the right of the United States to make use of the stamp without paying royalty. Title to the patent was in no way involved. What is said by Justice Brewer (137 U. S. on page 346, 11 Sup. Ct. 88, 34 L. Ed. 667) may be ambiguous, but is fairly well satisfied by applying it so as to give the employer a license. · He divided the master and servant situation into two classes: In one, where there is only a hiring for general service, the facts may be such as to support an inference of license to the master, and this is a question of fact for the jury. In the other class, where there is specific hiring to devise an improvement, the master's rights in any resulting invention arise as a matter of law. The extent of such rights, beyond a license, was not involved, and presumably not in the mind of the court. We think the language used, when the question before the court is remembered, can hardly be construed to extend to the whole patent. If so, it was entirely obiter.

We agree with the construction given by Judge Gray in the Hansen Case, infra, 137 Fed. at page 412, 71 C. C. A. 207, 2 L. R. A. (N. S.) 1172. If the self-canceling stamp had been useful as a label or seal for private manufacturers, and Clark had brought a suit against them upon the patent, it would hardly have been claimed that Justice Blatchford had decided that the patent belonged to the United States and not to Clark. Certainly, if the decision is given the broader meaning now attributed to it by defendant, it was in conflict with the thing decided in Hapgood v. Hewitt, and yet the majority of the court was the same as in the former case, including Justice Blatchford. Every presumption is that no overruling or even modification of the former case was intended.

Another thing should be noted in connection with this opinion. The case was in the Supreme Court on appeal from the Court of Claims (22 Ct. Cl. 335), where it had been held that, while the government did not obtain a specific interest in the patent or monopoly of the invention, nor a right to share in the profits thereof, so as to exclude other persons from the use of it, nevertheless it acquired the right to manufacture and use the stamp in its revenue service without liability to the inventor, and it was this decision which Justice Brewer

was affirming. In view of this, can it be supposed that he intended to say that the Court of Claims was wrong and that the government did take title to the patent?

In Dalzell v. Dueber Watch-Case Mfg. Co., 149 U. S. 315, 13 Sup. Ct. 886, 37 L. Ed. 749, it appeared that Dalzell had a patent for a device used in making watches. When he devised the improvement he was in the employ of the Dueber Company as a tool maker, and was following out the instructions of the president in trying to perfect an apparatus for making watch cores. The former superintendent had endeavored to do this, but had failed. Dalzell was instructed to take it up and carry it on. He succeeded. He made no demand for compensation, and the company paid all the expenses of obtaining the patent, which was necessarily taken in Dalzell's name. In the Circuit Court (38 Fed. 597), Circuit Judge Wallace found that these facts justified the conclusion that the patent was to belong to the employer, and ordered Dalzell to make a conveyance. The Supreme Court reversed this decision. Justice Gray wrote the opinion. On page 320 of 149 U. S., on page 888 of 13 Sup. Ct. (37 L. Ed. 749), he restates the proposition that the employer is not entitled to the patent "in the absence of express agreement to that effect." He then proceeds to discuss whether there had been such express agreement. Dueber, president of the employer, said "Yes," and Dalzell, "No." Judge Wallace had believed Dueber. The Supreme Court developed the reasons for deciding against him. It does not seem that Justice Gray or any member of the court knew of the exception now alleged. The facts stated by Judge Wallace show that the employment was to devise and perfect a particular thing—dies and forms for watch cores—and if such specific employment carried a right to the resulting patent, the decision of the Supreme Court was wrong. As it is, it must negative the existence of any such exception. It is true Justice Brewer dissented in this case, but the natural presumption is that he dissented because he agreed with Judge Wallace on the questions of fact involved.

It is suggested that in cases like those of Hewitt and Dalzell there was a general employment, which would not carry interest in the title to an invention, and upon the basis of which the specific duty to improve or make a particular thing was superimposed, and that if the specific duty were wholly independent of any general services it would efficiently support an inference of intent to convey any resulting patents. We do not see any distinction. The obligation of Hewitt or Dalzell to make an improved sulky plow or watch core was expressly created by special contract, and was no more and no less because he happened to be already on the pay roll.

Next among Supreme Court cases comes Lane v. Locke, 150 U. S. 193, 199, 14 Sup. Ct. 78, 37 L. Ed. 1049. The only question here involved (the facts are somewhat more fully stated by Judge Sage in [C. C.] 35 Fed. at page 289), was whether a license might rightly be inferred. The court quotes from the Solomons Case what is said about license; but the decison has no pertinence at all as to the supposed exception.

Next is McAleer v. United States, 150 U. S. 424, 14 Sup. Ct. 160, 37 L. Ed. 1130. Here there was a written license from the patentee to the United States, and the only question involved was as to the construction of the license and whether it was to be varied by parol. On page 430 of 150 U. S. (14 Sup. Ct. 160, 37 L. Ed. 1130) the court quotes from the Solomons Case Justice Brewer's language, which is supposed to establish the exception; but it is a casual quotation, and the opinion has no bearing upon the construction or meaning of the quoted paragraph.

The next case is Gill v. United States, supra. The opinion was by Justice Brown. The only question involved, as stated in the first sentence of his opinion, was whether the employer had a license. On page 435 of 160 U. S. (16 Sup. Ct. 322, 40 L. Ed. 480), however, he seems to assume that he is repeating the Solomons Case when he says that in the case of the specific employment the patent belongs to the employer. Not only is this completely obiter in the Gill Case, but it is a misunderstanding of the Solomons Case, because, if we correctly interpret Justice Brewer, he did not say what is here attributed to him; and it must have been inadvertent to say that the Solomons Case might have been decided on this ground, because in the Solomons Case it was stated by the Court of Claims, and agreed all around, that the patent did not belong to the employer. So far as we can find, this proposition, so stated by Justice Brown in the Gill Case, was then stated for the first time, unless by Justice Brewer.

It has been suggested that Hapgood v. Hewitt is discredited, because Justice Brown did not refer to it in his review in the Gill Case. There was no reason why he should. It turned out in the Gill Case that Gill was claiming exemption from the general rule that the employer had a license, because Gill had perfected his invention outside of working hours and with his own resources. Justice Brown therefore reviewed the cases which had sustained an employer's defense on the ground of license, to see if they justified Gill's theory. Hapgood v. Hewitt was not one of those cases, and there was no occasion to refer to it.

From this review it appears that in the Supreme Court the exception has been denied in two cases (Hapgood and Dueber), in general language, but where, in each case, the denial was essential to the result reached, and that it has been affirmed, in one case clearly (Gill) and in another doubtfully (Solomons), but when, in each case, it was irrelevant to the issue. The weight of authority in that court is thus beyond dispute. In no later case in lower courts has the alleged exception been involved, directly or indirectly, or quoted or referred to, excepting in the following:

In the Healy Case, 189 Fed. 49, 110 C. C. A. 613, and the Hansen Case, 137 Fed. 403, 71 C. C. A. 207, 2 L. R. A. (N. S.) 1172 (C. C. A. cases later mentioned), the exception is more or less definitely denied. In Wilson v. Wilson Co. (D. C.) 241 Fed. 497, District Judge Waddill quotes the paragraph containing the exception, as if it might be the rule in a proper case, but decides that in the case before him there was only a license. In Dowse v. Federal Co., 254 Fed. 309, Dis-

trict Judge Sanborn quotes Justice Brewer's ambiguous statement from the Solomons Case, and then quotes and approves Judge Gray's statement, in the Hansen Case, that there must be an express agreement to assign. He then goes on to decide that all the facts and circumstances and Dowse's employment as president and general manager in building up the company's business, based on the exclusive rights given by the patent in Dowse's name, justified the inference of an express understanding that the patent was to belong to the company and estopped Dowse from denying such contract. This was really the situation also in the Healy Case mentioned. In Ingle v. Landis Tool Co., 262 Fed. 150, District Judge Witmer quoted Justice Brewer's statement, and held that the employee inventor's conduct, continued long after his employment ceased, demonstrated his intent that the invention should belong to the employer; but, even under these facts, the decision was reversed. (C. C. A.) 272 Fed. 464.

From this further review it may be said that the alleged exception never has been applied or enforced in any case. In the last two cases cited, which come the nearest, it was of no importance whether the employment was general or specific. In fact, the employment was general in both of them.

Coming now to a discussion of the particular point by other courts: In the Hansen Case (Judge Buffington [C. C.] 128 Fed. 444) 137 Fed. 403, 71 C. C. A. 207, 2 L. R. A. (N. S.) 1172, Judge Gray's discussion makes it clear that the Court of Appeals does not believe the alleged exception is established by the Solomons and Gill Cases. Judge Acheson's dissent only emphasizes the fact that Hansen was employed to do a particular thing, and therefore shows that the opinion of the majority is an express disapproval of the dicta which Judge Acheson prefers to follow. The Hansen Case has several times been cited approvingly on the general proposition that there must be an express agreement to assign, and Judge Acheson's dissent has never received approval. In Ingle v. Landis (C. C. A. 3) 272 Fed. 464, 465, it was said by Judge Buffington that this decision had made a satisfactory working rule which had ever since (since 1895) been followed in the Third circuit.

In National Box Co. v. Healy, 189 Fed. 49, 56, 110 C. C. A. 613, the Circuit Court of Appeals of the Seventh Circuit seems to give its approval to this quotation (189 Fed. 56, 57, 110 C. C. A. 620, 621):

"The rule may be stated in a few words. No matter what the contract of service may be—whether for ordinary employment or for specific inventive work—the master cannot have title to an invention of a servant, in the absence of an express contract to assign it to him, although made in the course of the service and at the master's expense. Stray statements which seem to point to the master's right of ownership are to be found in some opinions, but these decisions cannot stand, as authorities against the main body of cases from which the above rule is gathered."

The court then concludes that it is sufficient to satisfy this rule if the employee consciously and deliberately contemplates that an invention, if made, shall belong to the master, although mere employment, general or specific, will not raise that inference. Judge Seaman was not willing to go even so far, but concurred because he thought

the evidence showed an express oral promise to convey. Speaking of the power to compel conveyance of the patent when there is an express contract, he says:

"I believe no other relation of the parties (fiduciary or contractual) in their undertaking can sanction such relief, nor furnish support therefor, beyond the undoubted weight of the evidence thereunder in corroboration of the testimony that inventions made were to be assigned."

This court had one phase of the question quite early, in Withington Co. v. Kinney, 68 Fed. 500, 15 C. C. A. 531. This decision was before the Gill Case, but five years after the Solomons Case. It makes no reference to the latter, but expressly follows Hapgood v. Hewitt. A license to the defendant was the only thing involved, but Judge Lurton evidently did not know of the alleged exception, because, although the employee testified that he was employed for the express purpose of devising a particular new machine, which he did devise and patent, Judge Lurton says (68 Fed. 502, 15 C. C. A. 533) that there was no evidence of any agreement by which the employer should have any interest in the patent. In the Barber Case (C. C. A. 6) 129 Fed. 370, 64 C. C. A. 40, 5 L. R. A. (N. S.) 1154, there is some implied approval of the proposition that there must be a definite agreement for patents to pass before they will do so, but the case is distinguishable from the present one because it goes off on the question of a license and its scope.

We do not find anything else helpful. The opinion in American Co. v. Wilson, 198 Mass. 182, 202, 84 N. E. 133, 126 Am. St. Rep. 409, discusses the subject, and applies the rule of license, and casually suggests an exception when the contract is expressly one to use inventive faculties, citing the Solomons and the Gill Cases, but it goes no further.

We conclude that the supposed exception cannot be accepted as an existing rule, and that an invention does not belong to the employer merely by virtue of an employment contract, as well when that employment is to devise or improve a specific thing, as when the employment is to devise improvements generally in the line of the employer's business. The contract of August, 1915, does not therefore, of its own force, convey to the employer the equitable title to the patentable inventions which Peck might make in the course of its execution, but gives to the employer a license only.

For reaching this conclusion there is another reason which has not been discussed in the case, but which would seem of itself to be sufficient. Peck's invention, as made and patented, extends beyond the field of the contract and of the employer's business. The making of automobile springs is only one of the purposes for which the patented machine may be used. Many of its claims reach its use merely as a forming or die machine in any factory for any purpose. We suppose that the exception which we have discussed, if it were valid, would not reach the case where the invention went beyond the scope of the employment, and was plainly not within the contemplation of either party, and even if it could be thought that in such case the employer obtained the exclusive right to the invention and the patent so far

as they applied to his use in his business, he would still have only a license. Pope v. Gormully, 144 U. S. 248, 12 Sup. Ct. 641, 36 L. Ed. 423.

Outside of the face of the contract, there is no evidence as to the intent of the parties at the time it was made, and we find no evidence of subsequent conduct by the parties sufficient to indicate Peck's conscious purpose that the title should pass or to establish an estoppel against him to that extent. He had no such participation and interest in the business as were thought in the Healy and Dowse Cases to support the inference of an actual intent to contribute inventions and patents. As to his participation for a time in the evident anticipation of the employer that the patent application should be made at its expense and for its benefit, this is said by him to have occurred after the work was nearly done, and while he thought there was an understanding for giving him further valuable considerations and in reliance thereon, and he says that, as soon as this reliance turned out to be unfounded, he withdrew from the plan for participation, and the employer never paid any expense or changed its conduct in the least on that account. This testimony is undisputed; and the case against him in this aspect is not so strong as that which in the Hansen Case was held insufficient.

[4] What was the extent of the employer's license? In this respect the questions are different as to the first six machines and the last four. There are two reasons why we think the title to the first six machines is in the defendant, wholly free from the monopoly of the patent. The first is that the case as to these machines is fully within the spirit and fairly within the letter of Rev. St. § 4899 (Comp. St. § 9445), which says:

"Every person who purchases of the inventor, or discoverer, or with his knowledge and consent constructs any newly invented or discovered machine, or other patentable article, prior to the application by the inventor or discoverer for a patent, or who sells or uses one so constructed, shall have the right to use, and vend to others to be used, the specific thing so made or purchased, without liability therefor."

It appears that in August, 1915, the parties entered upon this enterprise of developing new machinery. Mr. Peck, at Peoria, had actual charge of the construction work; the labor and materials apparently being paid for by the Pontiac Company. The record does not show the exact progress of the work, but the first complete machine was shipped from Peoria about March 26, 1917, and the other five very shortly thereafter. The patent was applied for on March 12th of that year. Without doubt, at this time some of the machines were nearly finished, and all of them were well along in construction. Taken as a group, they had been in the process of construction certainly for many months before March. We are quite satisfied that such a situation as this is within the limits contemplated by section 4899, and it follows that the Pontiac Company had a right to sell these six machines to the defendant free from the patent. Wade v. Metcalf, 129 U. S. 202, 9 Sup. Ct. 271, 32 L. Ed. 661.

[5] The other reason is that, even if section 4899 were not applica-

ble, the situation as to these particular machines is essentially the same as if they had been made by Peck and by him sold to the Pontiac Company. Where the thing patented is the product of the employer's business, or a process used by him, the license is not generally assignable, even to the employer's successor in business (Bowers v. Lake Superior Co. [C. C. A. 8] 149 Fed. 983, 986, 79 C. C. A. 493); but we find no case extending that rule of nonassignability, so as to reach merely the use of a patented machine which belonged to the employing company, and which was constructed for it by the patentee, with its material and its labor, and with satisfactory compensation to him for his supervision. We think the analogy of the decided cases permits the employer in such case to sell such machine with the free right to use it. In the language of the Solomons Case, "the instrument" or "the means" becomes the "property of the employer." See, also, Mitchell v. Hawley, 16 Wall. (83 U. S.) 544, 547, 21 L. Ed. 322; Boston v. Allen (C. C. A. 1) 91 Fed. 248, 33 C. C. A. 485.

[6] As to the last four machines, it must be held that such a license to construct the patented invention, for use in the business of the employer, as the Pontiac Company had, was not assignable, and could not have passed to the defendant by the ordinary purchase and sale of a business. Since the burden was on the defendant to establish a valid license, a decree for the plaintiff as to these four machines would be technically justified upon this record; but we are not satisfied to have final disposition made in that way. To apply our view of the law to the proofs, as they were shaped and allowed to remain in dependence upon the somewhat different view of the court below, might result in distinct injustice. Defendant may be advised that it can abandon any further claim of license as to these four machines and contest the patent on its merits—a matter about which we express no opinion—and otherwise it is clearly open to defendant to make what effort it can to establish a license on the theory of estoppel by reason of Peck's knowledge of the building of these four machines without objection, if such knowledge and conduct occurred, or on the theory of a practical consolidation of the Pontiac Company with the present defendant, if their relationship has that character. Lane v. Locke, 150 U. S. 193, 14 Sup. Ct. 78, 37 L. Ed. 1049.

The decree below is reversed, and the record remanded for further proceedings in accordance with this opinion.