## WIEGAND v. DOVER MFG. CO. et al.

## DOVER MFG. CO. et al. v. WIEGAND.

(District Court, N. D. Ohio, E. D. May 11, 1923.)

Nos. 363, 602.

1. **Patents ⬅114—Plaintiff in suit to compel issuance of patent must show right thereto as well as priority of invention.**

    In suit under Rev. St. § 4915 (Comp. St. § 9460), to compel issuance of patent for invention for which patent has been issued to another, plaintiff must not only show priority of invention but that he is entitled to a patent, and, if patent should not issue for want of novelty or patentability or because of prior public use, he cannot obtain relief, though in fact the original inventor.

2. **Patents ⬅114—In suit for patent, decision of Patent Office on question of priority accepted unless testimony carries conviction.**

    While, in suit under Rev. St. § 4915 (Comp. St. § 9460), to compel issuance of patent for invention already patented to another, trial court may reach conclusion on question of priority different from that reached by Patent Office, decision of Patent Office must be accepted as controlling unless the contrary is established by testimony which in character and amount carries thorough conviction.

3. **Master and servant ⬅62—Employer held entitled to use inventions which employee conceived and reduced to practice while in its employ and permitted it to use.**

    Where patentee of electric sadiron, and of process and apparatus for manufacturing it, conceived his inventions while employed by defendant and reduced it to practice on defendant's time and with its tools and facilities and services of its other employees and permitted defendant to use the inventions without making any claim for compensation, defendant has right to use them coextensive with life of the patents and needs of its business, whether resulting from implied license under Rev. St. § 4899 (Comp. St. § 9445), or from estoppel in pais.

4. **Master and servant ⬅62—Employer's right to use invention held not limited to machines made while inventor was in its employ.**

    Where patentee of electric sadiron and apparatus and process for making it conceived and perfected his invention while in defendant's employ and permitted use of the inventions without claiming compensation, defendant's right to use the inventions *held* not limited to particular apparatuses made and used during the employment and to such products as could be made with that number of machines.

In Equity. Suits by Edwin L. Wiegand against the Dover Manufacturing Company and others, and by the Dover Manufacturing Company and another against Edwin L. Wiegand. Bill in each case dismissed.

Frease, Merkel, Saywell & Bond, of Canton, Ohio (L. C. Wheeler, of Milwaukee, Wis., and Harry Frease, of Canton, Ohio, of counsel), for Dover Mfg. Co.

Harold E. Smith, of Cleveland, Ohio, for Wiegand.

WESTENHAVER, District Judge. These cases have been heard together and submitted for decision upon the same testimony. No. 363 is a patent infringement suit. It charges infringement by the Dover Manufacturing Company of United States letters patent No. 1,133,-

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

347, issued March 30, 1915, to Edwin L. Wiegand; No. 1,136,076, issued April 20, 1915, to Edwin L. Wiegand; and No. 1,154,953, issued September 28, 1915, to Edwin L. Wiegand. Cause No. 602 is a suit under section 4915, R. S. (Comp. St. § 9460), to compel the issue of a patent to the plaintiffs for the invention embodied in patent No. 1,133,347, notwithstanding the previous award thereof, with the exception of claim 6, to Edwin L. Wiegand by the proper Patent Office tribunals.

The record is exceedingly voluminous. The questions of law and fact discussed by counsel are numerous. I shall in this memorandum state only my conclusions, with such a brief exposition of my reasons as will inform counsel and interested parties of the grounds upon which my conclusions are rested.

Cause No. 602 will be disposed of first. The invention covered by patent No. 1,133,347 involves an apparatus for embedding an electrical resistance wire in the insulating portion of heating devices, such as an electric sadiron. Wiegand filed his application therefor January 9, 1914. The patent, containing 14 claims, was issued to him March 30, 1915. William A. Braun, assignor of the Dover Manufacturing Company, filed his application January 19, 1916. This was done after knowledge of the issue of Wiegand's patent and of its contents. Braun's application was almost an exact duplicate of Wiegand's drawings and specifications, and an exact duplicate of his 14 patent claims. February 15, 1916, an interference was declared in the Patent Office between Braun and Wiegand. The primary examiner of interferences awarded priority of invention to Wiegand. The examiners in chief reversed the primary examiner and awarded priority to Braun, and held that no patent could issue to him because an apparatus embodying the invention had been in public use for more than two years prior to Braun's application date. The Assistant Commissioner of Patents on appeal reversed the decision of the examiners in chief, except as to claim 6, and affirmed the decision of the examiner of interferences in all other respects, but held that no patent could issue to Braun for claim 6 because of two years' prior public use. On further appeal, the Court of Appeals of the District of Columbia affirmed the decision of the Assistant Commissioner in all respects. See Braun v. Wiegand, 49 App. D. C. 193, 262 Fed. 647. This suit, under favor of section 4915, R. S., seeks despite these proceedings the issue of the patent to Braun. It bases its right to this relief upon the same grounds as were adopted by the examiners in chief in making their award to Braun and on substantially the same evidence as was considered by those several tribunals.

[1] Plaintiffs do not show themselves entitled to this relief. In an action under section 4915, R. S., a plaintiff must not only show that priority of invention is with him, but also that he is entitled to the issue of a patent therefor, and if a patent should not issue, whether for want of novelty or patentability or because of prior public use, he cannot obtain relief, even though he is in fact the original inventor. See Hill v. Wooster, 132 U. S. 693, 10 Sup. Ct. 228, 33 L. Ed. 502;

Gold v. Gold (7 C. C. A.) 237 Fed. 84, 150 C. C. A. 286. Public use of more than two years prior to Braun's application date is clearly shown. That this use, upon the facts, was public and not secret, nor merely experimental, is established by Smith & Griggs Co. v. Sprague, 123 U. S. 249, 8 Sup. Ct. 122, 31 L. Ed. 141.

[2] Moreover, in a suit under section 4915, R. S., a heavy burden of proof rests on a plaintiff. It may be admitted that the trial court may reach a conclusion different from that reached by the Patent Office tribunals upon the same evidence and without new or additional evidence. Gold v. Gold (7 C. C. A.) 237 Fed. 84, 150 C. C. A. 286; Gold v. Newton (2 C. C. A.) 254 Fed. 824, 166 C. C. A. 270; Curtiss v. Janin (2 C. C. A.) 278 Fed. 454. But since the question involved is as to priority of invention, and that question has been decided by the patent officials, their decision must be accepted as controlling upon that issue, unless the contrary is established by testimony which in character and amount carries thorough conviction. The language often employed is:

"The burden of proof rests upon him, and every reasonable doubt should be resolved against him." Morgan v. Daniels, 153 U. S. 120, 14 Sup. Ct. 772, 38 L. Ed. 657; Gillette v. Sandelbach (7 C. C. A.) 146 Fed. 758, 77 C. C. A. 55; Roth v. Harris (2 C. C. A.) 168 Fed 279, 283, 93 C. C. A. 581.

Plaintiffs have not, in my opinion, sustained this burden. Their proof does not measure up to these exacting requirements. Reasonable doubt exists in more than one respect which must be resolved against them. The evidence here is substantially the same as was submitted to and considered by the Patent Office tribunals. The only new witnesses called on this hearing were W. J. Wise on behalf of Wiegand, and Albert S. Lamneck on behalf of plaintiffs. Some of the other witnesses were called here by a party other than the one who called them in the interference proceedings. The testimony of the witnesses who were absent or dead was read from the interference record. It is not seriously contended that any of the witnesses testified on this hearing otherwise or differently than they testified at the former hearing, except, as plaintiff asserts, that Wiegand's testimony now differs from his former testimony in the interference case, and also that his present and former testimony is impeached and discredited by his affidavit filed July 24, 1916, in cause No. 363. The only advantage this court has in weighing the testimony is limited to its opportunity to see the witnesses and observe their manner of testifying. The only other substantially new feature is the alleged discredit cast upon Wiegand by the claimed impeachment of his testimony. No useful purpose could be served by a review of the testimony, and to do so would unduly prolong this opinion.

That the issue of priority of invention is not free from doubt is evidenced by the different conclusions reached by the Patent Office tribunals upon the same record. At the conclusion of this hearing, my impression upon the issue now involved was in Wiegand's favor. A re-examination of the evidence, a comparison of Wiegand's present and former testimony, and due consideration of all the criticisms made of

Wiegand's case, have tended to confirm my original impression. Certainly, it cannot be said that plaintiffs have overthrown the mature and deliberate decision of the Patent Office tribunals by testimony which in character and amount carries thorough conviction. Nor do I perceive the asserted inconsistency in the judgment of the Assistant Commissioner of Patents and of the District Court of Appeals in awarding claim 6 to Braun and not awarding to him, for the same reasons, claims 1 to 4 and 10 to 14. The contention is that claims 1 to 4 and 10 to 14 are not limited to the pin-winding form and the new features of the apparatus developed to utilize the pin-winding form, but belong more properly with the broad claim 6 which the Patent Office officials awarded to Braun. Claim 6 was construed by them as embodying the first conception of the earlier groove-winding form of apparatus, and the other claims as more properly pertaining to the later and pin-winding form of apparatus with the other mechanical details necessary to operate it. This matter of construction of claims is peculiarly within the province of the Patent Office officials. I see no sufficient reason to disagree with their interpretation or conclusion. The bill in equity cause No. 602 will be dismissed.

In cause No. 363 infringement is charged of claims 1 to 5 and 7 to 14 of patent 1,133,347, being all the claims of the patent, except 6, which, as said, was awarded to Braun. No issue is made as to the validity of this patent, nor as to infringement. Patent No. 1,136,076 is for a process, and infringement is charged of claims 1, 2, and 3. Patent No. 1,154,953 is for the product, an electric sadiron, and infringement is charged of claims 4, 5, and 6. No issue is made as to infringement, but defendant denies the validity of all the claims in issue, for a variety of reasons. The defendant the Dover Manufacturing Company also interposes as a defense its right to use all these patents in the making, using, and vending of electric sadirons, by virtue of an implied license or shop right based on estoppel, coextensive with the life of these patents and with its business of manufacturing and selling its product.

[3] Inasmuch as infringement is not denied as to any of the patents, and validity is not denied as to patent No. 1,133,347, this claimed license or shop right should be first considered. The Dover Manufacturing Company, prior to the important dates of this dispute, had been manufacturing and selling ordinary sadirons. This for some years was its chief, if not its only, business. For several years prior to the dates of the present dispute, it had been developing an electric sadiron and had engaged William A. Braun, an electrical engineer and expert, for that purpose. Braun had previously obtained patents for an electric sadiron, with novel features of thermostatic control, and was believed by the company to be technically and otherwise equipped to make and conduct the experiments necessary to develop and produce an electric sadiron such as would meet the requirements of its business. During the year 1911, and perhaps prior thereto, such a sadiron had been made and was being sold, but trouble was being experienced with it, due primarily to imperfections in the insulating material in which was embedded the resistance wire of the heat-producing element. These defects were so serious that during the latter part of 1911 officials of the de-

fendant company were exerting themselves earnestly and industriously to remedy the defects and to produce a new and more satisfactory device. In so doing they had assembled much information and had obtained samples of the Alundum cement and a flat Nichrome wire, ultimately bringing the hoped success, all without either the knowledge or the participation of Wiegand.

Edwin L. Wiegand entered the company's employ in June, 1911. At that time he was 19 years of age, had some mechanical and electrical training, and had taken a one-year correspondence school course in electrical engineering. He was first put to work assembling sadirons. Later he took part in repairing defective sadirons which had been returned by customers. Still later he became an assistant to Braun, and devoted his attention largely to experimental and development work. In the course of his duties he was brought in contact with all the experimental work being carried on, and was made familiar with the company's past activities and experiments and learned the existing state of the art. He neither had nor acquired any knowledge with respect to electric sadirons, except as it came to him in the course of his employment. It has been found that he was the original inventor of the pin-winding form of apparatus, although Braun has been found to have been the originator and inventor of the earlier groove-winding form, out of which the later apparatus was evolved. The development of this apparatus began not earlier than the last months of 1911, and it was practically perfected during the year 1912. Some additions not material to this controversy were perhaps made at later dates. This apparatus owed its origin and existence solely to the need of a tool to perform the step of embedding the resistance wire in the insulating material. It has no other value, and is, so far as appears, susceptible of no other practical use.

The metallic base or the heat-producing element of the sadiron is first cast with a heating face and walls projecting in the opposite direction and defining therein a recess. The insulating material is placed in this hollow recess, and the resistance wire for the electric current is then embedded therein. In the process as practiced and as covered by the patent, a bottom layer of insulating material in plastic form is first deposited, compacted, and dried. Next another layer of like material is deposited, and the resistance wire, with the aid of the pin-winding form of apparatus, is embedded therein while the insulating material is still plastic. Later, and after drying, an additional layer of the same material is superimposed and the entire mass or unit is compressed and subjected to a high degree of heat to bake or vitrify it. In making the defective sadiron already referred to, the metal base, cast by the defendant, was forwarded to the Ward-Leonard Company, Bronxville, N. Y., which inserted the resistance wire in the insulating material by steps not greatly different from those above described, except that it did not have or use the patented apparatus. The insulating material used by that company was porcelain, which proved to be the source of the defects in the finished product. The insulating material of the new process and of the new product now in controversy is a specially manufactured cement, called Alundum cement. This

cement and its suitability for the use to which it was ultimately put was brought to the attention of the defendant company and its officials by representatives of the company making and selling it, and not by Wiegand. The change from porcelain to Alundum cement was made in defendant's factory during the early part of the year 1912. Wiegand admittedly participated with Braun and other officials and employees of the company in producing and developing the new sadiron and in the process for making the heating element. His claim is that the new process, including the use of Alundum cement and the various steps necessary to practice the process and the resulting product, the electric sadiron, were originated and invented by him. As already said, one patent is for the process and the other for the finished product.

In determining this controversy as to the apparatus, the Patent Office tribunals were much embarrassed by the fact that the issue narrowed itself down to the originality of the conception, since both parties relied upon the same reduction to practice which admittedly took place in the defendant's shop. Our difficulty will be no less now if one should undertake to determine the origin of each of the different steps of the process or each of the different features of the completed sadiron.

Wiegand continued in the company's employment until June, 1914. The completed pin-winding form of apparatus went into use during 1912. Prior to the end of his employment, two at least, and perhaps more, apparatuses had been made, to practice the wire-embedding step of the process. It is admitted that an additional number have since been made and used, but no more than were necessary in the normal progress and development of the company's business. These additional devices were set up in a building laid out and constructed for that purpose while Wiegand was still employed by the company. The new process, including the use of Alundum cement and successive steps in placing, compressing, drying, and baking, was also developed during the year 1912, and was practiced continuously thereafter during Wiegand's employment. The resulting product, the electric sadiron, with all the new and special features covered by patent No. 1,154,953, was likewise developed and made and sold extensively in due course of business while he was thus employed.

During all this period prior to June, 1914, no demand was made by Wiegand for compensation as an inventor. No claim was made by him to any company official that he had made any inventions or was intending to take out any patents or exact any compensation for the use of any alleged inventions. No agreement or promise was made to him in that behalf by any official of the company, and no assertion is made by him in that respect, except that he says that Braun once told him that the company would pay well if a successful electric sadiron could be produced. Wiegand's contention that he was misled, deceived, or overreached by promises or false representations is not supported by the weight of the evidence. On the contrary, the weight of the evidence is that he severed his employment without making any claim or demand for compensation or for the protection of any inventions. The evidence does not support his contention that he quit work because

he was asked to sign patent applications, although it seems evident that he quit because he was secretly intending to do so himself, and suspected that the company might itself make some patent application. During his employment he was industrious, efficient, and zealous, not merely in performing his regular duties, but in developing and improving the pin-winding apparatus, the process, and the product, and his compensation was from time to time increased; but the evidence does not show that the increases were intended to be in payment for any services as an inventor, but only as an employee.

On January 9, 1914, while still employed, he made his application for patent No. 1,133,347. This was done secretly and without the knowledge of the defendant company or any of its officials, and did not come to their knowledge until after his employment ended, nor until after the patent had issued. Included in this first application was also the process covered by patent No. 1,136,076; but, owing to the Patent Office rules, the application was divided and a new application for the process was, pursuant thereto, filed by him July 13, 1914. His application for the sadiron patent was filed September 24, 1914. The evidence shows that neither the company nor any of its officials ever learned of these two later applications or of the issue of patents thereon until the bill was filed in cause No. 363 in May, 1916.

Upon the foregoing facts, none of which is or can be seriously challenged, it must be held that the Dover Manufacturing Company has a full right to make use of all these patented inventions in making, using, and selling electric sadirons. This right, whether the result of an implied license under section 4899, R. S. (Comp. St. § 9445), or of an estoppel in pais, is coextensive with the life of the patents and with the needs of defendant's business in making and selling its product. And this conclusion applies as well to the apparatus as to the process or the product, for the reason that the apparatus owes its origin and existence to the process and product, and has no value except as a means in performing one step in the process. These conclusions are amply supported by the following authorities: Withington-Cooley Mfg. Co. v. Kinney (6 C. C. A.) 68 Fed. 500, 15 C. C. A. 531; Barber v. National Carbon Co. (6 C. C. A.) 129 Fed. 370, 64 C. C. A. 40, 5 L. R. A. (N. S.) 1154; McClurg v. Kingsland, 1 How. 202, 11 L. Ed. 102; Solomons v. United States, 137 U. S. 342, 11 Sup. Ct. 88, 34 L. Ed. 667; Gill v. United States, 160 U. S. 426, 16 Sup. Ct. 322, 40 L. Ed. 480. See, also, Hapgood v. Hewitt, 119 U. S. 226, 7 Sup. Ct. 193, 30 L. Ed. 369; Lane & Bodley Co. v. Locke, 150 U. S. 193, 14 Sup. Ct. 78, 37 L. Ed. 1049. Compare Peck v. Standard Parts Co. (6 C. C. A.) 282 Fed. 443, 454.

Wiegand's contention that he made these inventions on his own time, in his own shop, at home, with his own materials, and prepared there drawings which were taken to the company's factory and used, has been duly considered. What he did at home is not clearly proved, but, whatever it was, it pertained primarily to the apparatus. His present testimony in this respect is much discredited by its conflict with his earlier testimony in the interference case, and particularly by its conflict with the statements of his ex parte affidavit in cause No. 363;

but, conceding to be true all that he asserts, it would still be immaterial in view of the principles stated in the Gill Case, supra. In that case the employee had admittedly made a meritorious invention, had first reduced it to paper in the form of an intelligible drawing, on his own free time and at his own home, and had taken his invention in that stage of development to his employer, where it was perfected, developed, and reduced to practice in the employer's factory and at his employer's expense; and it was held notwithstanding, on the principles of an estoppel in pais, that the employer was entitled to a license or shop right.

Wiegand's further contention that his compensation was only for ordinary work and labor and not for services as an inventor, and that these last services have never been paid for, has also been given due consideration. Practically all of his work and labor was at the defendant company's factory and on its time and with the use of its tools and facilities, and with the services of its other employees. While he was working on his inventions he was not performing any other service in return for his wages. He used no materials, machinery, or facilities except those of his employer, and he had at all times the assistance and co-operation of his fellow employees in developing his inventions and in reducing them to practice. In McClurg v. Kingsland, supra, the employee's compensation was increased as a reward for a meritorious invention made and reduced to practice under those circumstances. In the Solomons Case, the inventor's compensation was not increased, and no payment was ever made for his invention, but his salary while working on his invention remained the same as it was before, and continued to be the same after his invention was finished. Mr. Justice Brewer, in commenting on this difference between the two cases, says:

"Indeed, there is but one difference between that case and this: In that, Harley's wages were increased on account of his invention; in this, Clark's were not; but such difference does not seem vital."

[4] Wiegand's remaining contention, that the defendant company's right to use his inventions should be limited to the use of the two or more apparatuses made and put to use during the term of his employment and to such product as could be made with that number of machines, has also received careful consideration. In my opinion, this contention is not tenable, for the reason already stated, that the apparatus is designed and used to practice one step only in a major enterprise, that of the company's business of making and selling electric sadirons. Under the authorities, no question can be made that the defendant company's right to use the process and to make and sell sadirons is coextensive with the life of the patents and with the growth of defendant's business, and would continue until its business was wound up. A licensee is not restricted to manufacturing with his own hands or selling by his own personal efforts. His right to operate his business cannot be thus narrowly restricted by an invention relating to one step or detail. In this aspect, the case falls within Withington-Cooley Mfg. Co. v. Kinney and Solomons v. United States. In the first case the employer's business was making and selling machinery, and

the defendant designed patterns and drawings for a machine found to involve invention; yet it was held that the employer's right to make and sell machinery was not limited to the patterns and drawings produced by the employee, but was coextensive with the needs of the employer's business. In the second case, the right of the employer, the United States, to use the inventor's patented self-canceling stamp was not limited to the office in which it was first used, or to the stamps first made, but included the right of such use in all the business for which it was developed and invented.

The principles upon which this defense and the rule invoked in its support rest are well stated in the Solomons Case, by Mr. Justice Brewer, in these words:

"So, also, when one is in the employ of another in a certain line of work, and devises an improved method or instrument for doing that work, and uses the property of his employer and the services of other employés to develop and put in practicable form his invention, and explicitly assents to the use by his employer of such invention, a jury, or a court trying the facts, is warranted in finding that he has so far recognized the obligations of service flowing from his employment and the benefits resulting from his use of the property, and the assistance of the coemployés, of his employer, as to have given to such employer an irrevocable license to use such invention."

That the irrevocable license referred to was limited by or rested on section 4899, R. S., is repelled by the Gill Case, where it was held that the employer was protected and the inventor barred, upon the equitable principles of estoppel in pais. These equitable principles are, it seems to me specially applicable to the facts of this case. Wiegand entered the defendant's employ and became familiar with its business. In that employment he acquired confidential information and learned the existing state of the art. He found out what had been done by the defendant company to produce an efficient sadiron and the reasons why its existing sadiron needed improvement, as well as the intention of the company so to improve it. Its accumulated stores of experience and its materials and facilities were placed at his disposal. It was in this atmosphere and under the pressure of business necessity that all of these inventions were produced. Whatever originality Wiegand contributed was only one factor in the evolution of the three inventions. The entire development and reduction to practice was made at the risk, cost, and expense of the employer. If Wiegand's present contentions are sound, the result would be that he entered the company's employ in 1911 with nothing, and left it in June, 1914, the practical owner of its electric sadiron business, for his patent monopoly confers not alone the right to royalty or compensation, but the right to exclude the defendant from making, using, or vending the patented inventions. These logical consequences emphasize the unsoundness of his contentions, both at law and in equity.

The defendant company contends also that claims 1, 2, and 3 of patent No. 1,136,076, and claims 4, 5, and 6 of patent No. 1,154,953, are invalid. Upon mature reflection, I have concluded that, in view of the conclusion already reached on the other defense, I should not determine these questions of validity. Defendant not being the owner of these

patents and having the right of use, as herein found, has such a remote or contingent interest in the question that a determination is not called for in its interest. Whether it will ever be necessary to determine the validity of these claims depends on the remote contingency of Wiegand's becoming involved in litigation with some one else, whose interest it will be to raise the question of validity. To decide that question now would savor of the determination of a moot controversy.

The bills in both cases will be dismissed. The respective plaintiffs therein will pay the taxable court costs, except the costs of summoning witnesses, the fees of witnesses, and the services of the stenographer. Each party will pay the costs of summoning and the attendance fees of his own witnesses and one-half of the stenographic services. Decrees will be entered in conformity herewith.