## ST. LOUIS & O'FALLON COAL CO. v. DINWIDDIE et al.

No. 1723.

District Court, D. Maryland.

Nov. 10, 1931.

Nagel, Kirby & Shepley and A. C. Orrick, all of St. Louis, Mo., Randolph Barton Jr., and Forrest Bramble, of Barton, Wilmer, Ambler & Barton, both of Baltimore, Md., for plaintiff.

Thomas G. Haight and Edward J. O'Mara, both of Jersey City, N. J., Edgar Allan Poe, of Baltimore, Md., Arthur G. Logan, of Wilmington, Del., Francis R. Stout, of St. Louis, Mo., R. A. McCrady, of Pittsburgh, Pa., and William H. Schaumberg, of St. Louis, Mo., for defendants.

WILLIAM C. COLEMAN, District Judge.

This is a suit in equity brought to determine the plaintiff's right to certain inventions, made by certain of the defendants while employed by the plaintiff to conduct tests for the purpose of determining the commercial possibilities arising from the production of insulating brick, semi-coke smokeless fuel, and a variety of crude by-products, through the method of low-temperature distillation of coal.

The bill of complaint asks for relief by injunctions, preliminary and permanent, restraining defendants from using, selling, assigning, or otherwise disposing of, and from disclosing except to the plaintiff or its representatives, these inventions, embodied in four applications for United States letters patent filed by the three individual defendants and now held, by virtue of assignment, by the fourth, or corporate defendant, the Bashioum Producer Retort Company, a holding company formed and owned by the other defendants; and also that the court decree that plaintiff alone has full and complete equitable title to all of these inventions. The suit was brought originally against defendant Dinwiddie alone, but later the other three defendants were, by agreement, made parties to the proceeding, and similar suits, which the same plaintiff had instituted against certain of the defendants in other jurisdictions, have not been pressed, pending a decision in the present proceeding.

The defense of the two principal defendants, Cuno and Bashioum, is twofold: First, that they were never employed to make the inventions which are involved in the present controversy, but that these were conceived outside and independently of their employment by the plaintiff; second, that defendant Dinwiddie, while acting as agent for the plaintiff, made representations as to the terms and conditions upon which defendants Cuno and Bashioum would be protected in their inventions, upon which these two defendants acted, and which are binding upon the plaintiff, because such representations were within the scope of defendant Dinwiddie's apparent, if not actual, authority.

Defendants consented to the issuance of a preliminary injunction. The case was thereupon heard upon the bill and answer. A large amount of oral and documentary testimony was presented, lengthy arguments had, and briefs filed.

Prefatory to a summary of the history of the employment of the three individual defendants by the plaintiff company, out of which the present controversy arises, it is necessary to understand the so-called Kern processes, and the reason for the plaintiff becoming interested therein, and later employing these three defendants in connection therewith. For a number of years prior to 1928, the low-temperature distillation of cheap coals had been developed in Great Britain and Germany to the extent of proving its great commercial value. One Ludwig Kern, a German chemist, assisted by his two sons, had invented a number of processes for the production of insulating brick by low-temperature distillation of coal. These processes he had patented in Germany and other foreign countries, and they were also covered by numerous letters patent and applications for letters patent in the United States. And so it was that in the spring of 1928 the Messrs. Kern came to the representatives of the Adolphus Busch Estate of St. Louis, of which the plaintiff company is a subsidiary, claiming they had developed various novel and economical processes, by low-temperature distillation of bituminous coal, for the production of insulating brick and its various by-products, including tar, benzol, ammonium sulphate, and many others, and also of a smokeless fuel known as semicoke, and sought financial support necessary for the development of these processes, and for the production and marketing of the products of these processes. Their representations so appealed to the trustees of the Busch Estate, who were seeking the most profitable ways to utilize the extensive coal properties that belonged to the plaintiff company, that through the plaintiff company they entered into two formal written agreements with the Kerns, the first relating to the Kern processes for the production of insulating brick and other insulating materials and their by-products, by low-temperature distillation of coal; and, the second, a supplementary contract, extending the terms of the original agreement, in a manner very important to the present controversy, as hereinafter explained. This second agreement was made some four months later, after the defendants' employment by the plaintiff had advanced to a point where defendants realized there was perhaps even greater commercial potentiality in the manufacture of smokeless fuel than of insulating brick, under the Kern processes.

The vital parts of the two agreements, considered as an entity, are as follows: First, should examination of the Kerns' title to the patented and other inventions in question prove satisfactory, provision was made for a preliminary test period consisting of two parts: (1) A laboratory test to determine whether the products and by-products of these inventions were capable of being profitably manufactured for commercial purposes; (2) an investigation of whether, "under the state of the art, the inventions used in such laboratory manufacture have been or can be covered by letters patent of the United States issued or to be issued to the chemists [the Kerns] or their assigns, sufficient in scope and protection to obtain a patent monopoly that will control the manufacture on a commercial scale of the said products and by-products." During this preliminary test period, specified weekly payments to the Kerns were provided for. Second, if the results of these two investigations proved satisfactory, plaintiff agreed to construct a manufacturing test unit of specified capacity, and with it to conduct an experimental test for the purpose of both "demonstrating the manufacturing possibilities to be developed through the said inventions and services of the chemists" (the Kerns) and also "of testing the market possibilities" of the experimental output, "and the net profits to be expected from such manufacture on a larger scale." Third, if the results of both the preliminary test and the manufacturing test proved satisfactory, the plaintiff agreed to elect, within a specified period of time, whether or not it would exercise the exclusive option given it to acquire the patented and other inventions of the Kerns. Fourth, if it elected to exercise such option, then various enumerated patents and

applications for patents were to be transferred to a corporation to be formed by the plaintiff for the development, manufacture, and marketing of the products and by-products of these inventions.

It was also further agreed that to plaintiff or its assigns, or to this new corporation, if formed, the Kerns should assign "complete title to any and all inventions of processes and (or) devices or articles, which they now have or which they may hereafter during the term of said agreement originate or invent or otherwise acquire, relating either directly or indirectly to the distillation or carbonization or other production of any material, or combinations of materials, carbonaceous or mineral, and (or) relating to any and all by-products resulting therefrom." Also, the defendants agreed "immediately upon making any new discovery or invention relating to the subject matter of said agreement as amended hereby, to give full written information and description thereof to the second party [plaintiff], its assigns, or to the said corporation to be formed by second party, and to co-operate with second party whenever thereto requested, in applying for and obtaining letters patent on all inventions covered by said agreement as amended hereby and in causing title to such letters patent to be vested in second party, its assigns or said new corporation."

The character and amount of the stock of the new corporation was to be left to plaintiff's determination; the Kerns were to receive 40 per cent. of the voting stock; they obligated themselves to contract with the corporation to give it their exclusive services as chief research, laboratory, and factory chemists over a ten-year period, and to assign to it all their future inventions of a like or related nature. It was further provided that at least one of the Kerns should be an officer and a member of the board of directors of the corporation.

For some time prior to this contractual relationship which was entered into between the plaintiff and the Kerns, defendant Dinwiddie had been employed by the Busch Estate in the capacity of what was termed manager of public relations, or, in other words, a general factotum, being engaged in work largely of a political or quasi political character. He was a newspaper man by training and not a scientist. It was his investigation of the Kerns' claims, made at the request of the Busch Estate, which led to the making of the contracts just referred to, because, as Mr. Dinwiddie states in his first report to the Busch Estate, under date of November 26, 1929, "A preliminary check up of the Kerns' claims, their past history, their integrity and reliability, seem to warrant us in entering into a modest contract with them so that our interests might be protected while the Kerns prove they could manufacture the commodities named above." The original contract with the Kerns contemplated, as we have seen and as Mr. Dinwiddie explained in his last report of April 11, 1930, to the committee in charge, "the production only of insulating brick and other insulating materials to be made from raw materials in our mines." But, as the report continues, "developments in the laboratory show, among other things, that we have the materials from which can be made a very superior smokeless fuel in the nature of coal, for both domestic and industrial use. Later, the Kerns' contract was amended and supplemented by a further agreement to include whatever rights they then, or might thereafter, have with respect to the coke and the related and unrelated products, processes and invention." At this time Mr. Dinwiddie was being paid for his services, pursuant to contract, at a fixed salary of $125 per week, with a bonus of $10,000, conditioned upon his activities being successful. On April 11, 1929, this entire bonus had been fully paid him.

The entrance of the other defendants, Drs. Cuno and Bashioum, into the picture and the reasons therefor, are also best explained by Mr. Dinwiddie's own statement contained in his report of April 11, 1930. "It soon became evident that the Kerns," states Mr. Dinwiddie, "while possessing ability as chemists of a high order, do not possess that mechanical and manipulative knowledge and skill which is so essential in demonstrating practical theories which they set forth in patent applications and in laboratory demonstrations. It was to provide this manipulative and engineering service that I was assigned to the work by the trustees of Adolphus Busch's Estate, and to the same end that I was authorized to associate with me in the work Dr. Cuno of St. Louis and later, for more special services, Dr. Bashioum of Pittsburgh. With the assistance of Dr. Cuno and with the use of inexpensive equipment in St. Louis we designed and constructed, entirely by ourselves, a small commercial plant embodying certain fundamental practices well known. * * * The Kerns frankly acknowledged they lacked the engineering and manipulative skill necessary to give practical effect to the theories they had evolved in the laboratory, so the plant has been continuous-

ly operated by Dr. Cuno and myself while the Kerns did their work in a well equipped laboratory. * * *" Mr. Dinwiddie stated in his oral testimony that he retained Cuno because of his own limited chemical knowledge. Dr. Cuno was an engineer of the Industrial Bureau of St. Louis, and had been, for seven years professor of industrial chemistry and metallurgy at the Washington University, St. Louis, and a consulting mechanical and mining engineer. "Though his position with us has been as a consultant," stated Mr. Dinwiddie in his report of November 26, 1929, "he has devoted much of his time to us in prolonged experimentation and practical development of the Kern processes."

On the recommendation of Cuno that he needed the advice and assistance of a consultant with better laboratory facilities than he had heretofore experienced in dealing with a Dr. Wallace, who had first been retained in Pittsburgh, he was authorized to employ Dr. Bashioum, in a consultant capacity, and he did so in January, 1929. Dr. Bashioum was another chemical engineer of extended experience, and head of the Chemical Engineering Department of the University of Pittsburgh. Unfortunately, no written agreements were ever entered into between the plaintiff, Dinwiddie, Cuno, or Bashioum respecting their services, and it is the absence of any definitive understanding which led to the present litigation. The plaintiff paid all of the expenses involved in the project, including the establishment and maintenance of the laboratory in St. Louis. Dinwiddie was paid $125 a week and expenses, which totaled, during the period here in controversy, more than $17,000. Dr. Cuno was first paid on a per diem basis, $50 a day; later, $300 a month in addition to his expenses, and he received in all over $7,000. Dr. Bashioum was paid entirely on a fee basis, which aggregated, in addition to his expenses, more than $5,000. Total expenditures, including these items, incurred by the plaintiff, were approximately $85,000 up to the time that defendants severed their connection with plaintiff.

◼ We have seen that defendants' contention is twofold. A summary of their first defense, which underwent amendment after institution of the suit, is that, conceding that defendant Dinwiddie has no direct claim upon the inventions or discoveries because he invented nothing, and was therefore erroneously joined as a coinventor before the Patent Office through an innocent mistake as to his connection with the inventions—an error which his counsel have sought to cure by the filing of formal disclaimers—nevertheless, the other individual defendants, Drs. Cuno and Bashioum, do have such direct claim, in that the discoveries which they are now claiming as their own property were not made in the course of their employment in connection with the Kerns' processes, but were made quite independently thereof, and without any connection therewith; that, in fact, one of their discoveries actually antedated their entire services for the Busch Estate; and that therefore they are not brought within the established rule whereby an employee's inventions become the property of his employer.

Whether this argument is tenable depends upon the character of defendants' employment, which, in turn, in the absence of more than verbal agreements to guide us, can only be satisfactorily determined after an analysis of the objects sought to be attained by the employment of these men. Again, the best evidence of what those objects were is to be found in the written reports of the defendants themselves, prepared and rendered before the controversy began. In Dr. Cuno's report of November 26, 1929, to Mr. Dinwiddie, who had employed him on behalf of the plaintiff, in which he reports the progress up to that time of the work accomplished at the laboratories in St. Louis, the object of his experimental work is stated as follows:

"The purpose as set forth for the organization of the experimental laboratories at this location was to continue the preliminary experiments, carried out at the Department of Chemical Engineering of the University of Pittsburgh, on the Kern process for making a smokeless domestic fuel from inner group Illinois coal and also the manufacture of insulating brick of a more or less refractory nature from such coal incorporated with clay of the nearby Missouri and Illinois districts.

"To these original problems as the work progressed it was found advisable to add other researches as follows:

"The possibility of preparing a metallurgical coke low in sulphur.

"The preparation from the clay found in the coal mine of an artificial Fullers Earth suitable for the filtration and decolorization of edible fats, edible oils and petroleum products.

"The preparation from O'Fallon coal of a decolorizing carbon for decolorizing corn syrup, malt syrup and like solutions.

"Experiments leading to the benefication of low grade Missouri iron ores by incor-

porating them with treated coal as practised with the clays, and after distilling and partially decarbonizing, in order to reduce or partly reduce the iron oxides contained.

"An attempt to utilize or make valuable the oil shales produced by a by-product of coal mining operation which, heretofore, have not only been a waste product but a hinderance to efficient mine operation."

Dr. Cuno, in this report, then takes up in succession each of the enumerated problems; traces the process used in each case, the experiments tried and the results attained; and concludes with the recommendation that the plaintiff proceed, in accordance with a plan presented with the report, with the manufacture of insulating refractory brick and smokeless fuel, artificial Fullers Earth, and a decolorizing carbon, utilizing, as far as possible, the screen coal, semifire clay, and shale obtained as by-products from the coal mines of the plaintiff company.

Passing over for the moment a consideration of that branch of defendants' first contention, which is based upon discoveries claimed to have been conceived or originated by one or more of the defendants at a time, or times, when they were not employed by the plaintiff, and turning to the broader phase of that first contention to the effect that what the defendants conceived and originated was not within the contemplation of the terms of their employment, a mere review of what has already been shown as to the broad scope of the research and development work contemplated under the contracts with the Kerns is sufficient to prove that this argument is untenable. Every one of the four inventions in controversy for which patents have been applied for unquestionably falls within the scope of those contracts. The original Kern contract was extended by the supplementary agreement so as to embrace "all inventions of processes and (or) devices or articles, which they [the Kerns] now have or which they may hereafter during the term of said agreement originate or invent or otherwise acquire, relating either directly or indirectly to the distillation or carbonization or other production of any material, or combinations of materials, carbonaceous or mineral, and (or) relating to any and all by-products resulting therefrom." A broader field of inquiry in a given branch of the particular art is difficult to conceive. The plaintiff, that is to say, the Busch Estate, was given virtually unlimited scope to apply its resources for the purpose of ascertaining whether, in this field, there were sufficiently attractive commercial possibilities to warrant it investing any considerable amount of money therein. This being true, it is, of course, entirely frivolous to say that those placed by the plaintiff in charge of this inquiry were not expected to follow up every conceivable idea which might unfold itself in the course of their researches and experiments, to the end that they might determine whether any one or more of the Kern ideas, either in its then state, or by modification or improvement, would accomplish the desired result. The inventions disclosed by the patent applications of the defendants relate to coal products and the manufacture thereof (application number 423702); formation and treatment of plastic materials and the products thereof (application number 423703); a method and apparatus for distillation of coal products and the manufacture of smokeless fuel briquettes (application No. 441232); and to ceramic products and the manufacture thereof (application No. 444344). Thus, clearly, all these inventions relate to matters well within the contemplated field of the inquiry delegated to each of the three defendants, Dinwiddie and his technical assistants, Cuno and Bashioum. The Kerns' agreements formed the basis for their employment. They are presumed to know the contents of these agreements. Their reports clearly show that they did have this knowledge, and adapted their researches and tests accordingly.

We turn now to that other branch of defendants' first contention, namely, that the Bashioum retort and the Cuno water binder process, developed in the course of the experimentations in smokeless fuel manufacture, were conceived at times when the defendants were not employed by the plaintiff, and that therefore under no theory can properly be said to belong to the plaintiff.

A thorough examination of the evidence compels the conclusion that the great weight of the credible testimony, as well as of the documentary evidence, refutes this contention. In the first place, there is the uncontradicted testimony that none of the defendants in any of their reports, letters, or conferences up to the time of actual disagreement ever claimed that these particular devices or any others had been conceived outside of their employment by the plaintiff.

We will first consider the matter of the Bashioum retort which is covered by patent application in suit, No. 441232. Counsel for defendants contend that, since Dr. Bashioum's employment by plaintiff was fragmentary; since his first work in January and February,

1929, was merely to distill certain sample bricks sent him, the origin and exact composition of which he did not know; since prior to his next period of employment, which did not start until January, 1930, and which was primarily for the purpose of fractionating one of the by-products of distillation, he had conceived and actually disclosed informally to Dinwiddie and Cuno his discovery of the particular retort—this invention cannot be treated as having been made during, or as any part of, his employment by the plaintiff. But here again the written reports are to be taken as the best evidence of the fallacy of such a contention. Dinwiddie, in his report of December 22, 1929, said: "Dr. Bashioum has made a desirable and logical proposition to me, that is, that in view of his now superior equipment that we make up here in St. Louis a ton of material in coke and bricks, including the new slate brick, dry the material and come to Pittsburgh and give him a chance to work out a definite commercial program, based on the results of retorting and redistilling." That Bashioum was so employed is confirmed by Dinwiddie's last report of April 11, 1930, in which he says: "Dr. Cuno and I were not satisfied with the retorting method used in the St. Louis experimental laboratory. * * * With a view of solving this difficulty and also of determining the commercial value of the tars, Dr. Cuno and I returned to Pittsburgh and with Dr. Bashioum's aid, and with the more elaborate equipment at his disposal —all of which is on a semi-commercial scale —we carried on a new series of tests.

"After six (6) weeks of experimentation, we are convinced that we have solved this difficulty. We have designed a retort the principles of which have been tested in the Pittsburgh laboratory with success." (Italics inserted.)

The argument of the defendants must be treated as an afterthought because of the further, cumulative evidence to contradict it, as a part of which the following may be pointed out as having special probative value: Cuno's letter to Dinwiddie of February 5, 1930, in which the writer states that the new internal heat retort was the joint conception of himself and Bashioum, that is, "Have a preliminary design for retort which Bashioum also approves. Some of this is from his suggestion and I think can be patented. I am asking you frankly do you want Bashioum to share in the patent ideas or not? * * * " Cuno's letter to Dinwiddie of February 7, 1929, recommending the building of retorts of their own design; Dinwiddie's letter to Busch

of February 16, 1930, stating that "our first tests here in Pittsburgh laboratory on a system of internal heating of the retort instead of external heating have turned out finely; * * * " letter of the same date, to the same effect, from Dinwiddie to Kirby; and Dinwiddie's last report, dated April 11, 1930, to which reference has already been made, which specifically indicates that in the spring of 1930 the designing of a proper retort was part of the work conducted at Bashioum's laboratory in Pittsburgh, as well as work involving distillation and fractionating the tar by-products. In the face of all of this documentary evidence, the attempt to weave a different story out of it, in conjunction with what Bashioum and the other defendants testified to at the trial, is unconvincing. We are satisfied that the retort here in controversy was the joint invention of Bashioum and Cuno, conceived after January 11, 1930, while they were both employed by plaintiff. The patent application is in both of their names (and also Dinwiddie's), yet there can, of course, be no serious claim that in December, 1929, when Bashioum is said to have disclosed the idea to Cuno, or prior thereto, it was also, in part, the product of Cuno's brain. This would be wholly inconsistent with defendants' argument. Yet, without it, we have a glaring inconsistency left unexplained.

Respecting the claim that Dr. Cuno conceived the water binder process some two years previously while in Germany, and that therefore he was merely applying this preconceived idea to his work for the plaintiff, and did not originate it during such employment, let us turn to his own statement, in his written report of November 26, 1929. He said: "An important discovery was that the water obtained with the tar in the distillation contained a slight amount of free acid and was heavy in dissolved chlorides. This water, when of the strength of 4° to 5° Baume can be used as a substitute for the acid treatment either without the addition of more acid or by making it up to strength with acid or mixing it with distillation water of heavier Baume."

Defendants argue that this discovery that less hydrochloric acid than had originally been thought possible by the Kerns' process could be used, is not to be confused with Cuno's later disclosure that clear water alone could be used—based upon a discovery which he had made two years earlier in Germany. Since this argument is unsupported by any credible testimony, and since the total elimination of the acid content, for econ-

omy sake, was the logical, desirable evolution after its *partial* elimination, we reject the argument as totally unconvincing. If it was, in fact, *his own earlier* invention, why did he apply for a patent on it jointly with Dinwiddie?

The defendants' written reports, dispassionately prepared and submitted, before there was present the faintest ground for disagreement, and when all concerned were buoyed up and carried along by the favorable commercial outlook as a result of what the defendants had been doing, leave no room for doubt. They are the *best* evidence, and therefore make it impossible to put the stamp of credibility upon what the defendants, a year or more later, in the heat of controversy, have said, whether such statements be treated as willfully false, or merely the result of unintentional misdescription of what actually transpired.

Coming finally to defendants' second ground of defense, namely, that Dinwiddie, while acting as agent for the plaintiff, made representations as to the terms and conditions upon which Dr. Cuno and Dr. Bashioum would be protected in their inventions, upon which these two defendants acted, and which are binding upon the plaintiff, because such alleged representations were within the scope of defendant Dinwiddie's apparent, if not actual authority, we fail to find, upon the credible evidence, that Dinwiddie ever made such representations. Therefore it becomes unnecessary to consider their effect had they been made, other than to say that, if they had, they would of course not be conclusive of the primary issue here presented; namely, whether plaintiff is entitled to the inventions. At most the result would be to concede to the defendants a right to *some undetermined* stock interest in the new corporation, if and when it might be formed, depending entirely upon plaintiff's election.

These alleged representations of Dinwiddie may be summarized as follows: That Dinwiddie told Dr. Cuno and Dr. Bashioum that they would be adequately taken care of with respect to their inventions here in controversy by being given stock interest in the company to be formed pursuant to the Kern agreement.

Again, the best evidence of the nonexistence of such representations is the total absence of any reference to anything of this kind in any of the written reports, or in the correspondence between the parties, over a period of many months, right up until the time when the conferences began which resulted promptly in the severing of relations.

It is impossible to reconcile the conflicting oral testimony. Haynes, plaintiff's patent counsel, testified that the defendants, upon being instructed by Mr. Nagel that they should make applications for their several patents in their own name in order to comply with the law, but should assign them to the holding company to be formed, stated to him (Haynes) that they so understood their status respecting the applications, and would execute the formal assignments when the corporation was formed. Messrs. Kirby and Nagel testified that even as late as the meeting of April 26, 1930, in their offices, when, for the first time, the defendants displayed a hostile attitude, they did not then claim ownership of the inventions, but each merely claimed a 20 per cent. stock interest in the new corporation—a claim which was then being asserted for the first time—and, furthermore, that this meeting ended with all three of the defendants agreeing to hold the patents in trust for the Busch Estate, pending final agreement as to the exact interest they should be allowed in the new corporation; Messrs. Nagel and Kirby having advised them that the requested 20 per cent. interest was too great.

All of the foregoing testimony is flatly contradicted by all three defendants. Dinwiddie said he had originally been told by Mr. August A. Busch that he would get a stock participation in the company to be formed; and that Mr. Busch held out the same promise to Cuno and Bashioum. Cuno and Bashioum in turn testified that Dinwiddie told them they would be properly taken care of by a stock participation in the company to be formed, and they also denied that they had ever agreed to assign the patents without such consideration.

There are several strong reasons why the foregoing testimony of the defendants cannot be given credence. If they really believed in good faith that they owned the inventions as a matter of right, or were entitled to stock participation in the new company by virtue of representations made to them by Dinwiddie, acting for the plaintiff, why did not they broach one or both of these matters in their formal written reports, or in their conference with Messrs. Nagel and Kirby, at which they admit they fully and freely discussed whether disclosure of their inventions should be made to the Kerns, and were told to make applications for the patents in their own names? If Dinwiddie had, in fact, agreed that they should have a stock interest in the new company—and assuming it may have been rea-

sonable for him to have done so without specifying the extent of such interest—why did they not refer to such agreement in their various conferences with Messrs. Nagel and Kirby when they made demand upon these gentlemen for such stock interest? We find no reliance upon such an agreement, but they made their claim as a matter of independent right. Why, if the inventions were theirs, did they acquiesce in the plaintiff paying all fees incident to their applications in the Patent Office? This attitude on the part of the defendant embraces the essential elements of estoppel. Indeed, when we add the further admitted facts that they not only failed to disclose that they had already assigned the applications to a holding corporation, which in turn assigned them to defendant Bashioum Producer Retort Company, when they were still conferring with plaintiff's representatives as to the legal ownership of them (shortly after which they all resigned), but on the contrary implied that as yet they had made no assignment, their attitude lacks the characteristics of good faith.

Having reached the conclusion of fact that all of the inventions here in suit are of the kind embraced within the terms of Dr. Cuno's and Dr. Bashioum's employment by the plaintiff, and, further, that all of these inventions were conceived in the course of and as a part of such employment, there remains to be determined the question of law as to whom these inventions belong. Are they the property of the defendants Dr. Cuno and Dr. Bashioum, the inventors, or of the plaintiff, their employer?

■ We conclude that they are all the property of the plaintiff. A statement of reasons for this conclusion calls for a summary of the different sets of conditions under which the law awards the fruits of inventive skill to the employee, or vice versa, either in whole or in part.

■ First, an invention made incidentally by an employee in the course of his regular or general employment, and at his employer's expense, is the property of the employee, unless he has agreed, either expressly or impliedly by virtue of some special terms of his employment, to transfer ownership to his employer; and, unless he has done so, the employer is at most entitled to a nonexclusive, nontransferable shop right, or irrevocable license to use the invention. Hapgood v. Hewitt, 119 U. S. 226, 7 S. Ct. 193, 30 L. Ed. 369; Solomons v. U. S., 137 U. S. 342, 11 S. Ct. 88, 34 L. Ed. 667; Dalzell v. Dueber Watch-Case Mfg. Co., 149 U. S. 315, 13 S. Ct. 886, 37 L. Ed. 749; Gill v. U. S., 160 U. S. 426, 16 S. Ct. 322, 40 L. Ed. 480; Pressed Steel Car Co. v. Hansen (C. C. A.) 137 F. 403, 2 L. R. A. (N. S.) 1172.

■ Second, if, however, the employee is engaged to devise or to perfect a particular article or process, all discoveries made by him in connection therewith belong to the employer, since in making such discoveries the employee is merely doing what he was hired to do. Standard Parts Co. v. Peck, 264 U. S. 52, 44 S. Ct. 239, 68 L. Ed. 560, 32 A. L. R. 1033; Houghton v. U. S. (C. C. A.) 23 F. (2d) 386; Wireless Specialty Apparatus Co. v. Mica Condenser Co., Ltd., 239 Mass. 158, 131 N. E. 307, 16 A. L. R. 1170. In the first of these cases, involving a contract by which the employee, a designer of machinery and a patent lawyer who was not otherwise employed by defendant company, was specifically engaged at a fixed monthly compensation, plus certain bonuses, to devote his time to the development of a process and machinery for the production of the front spring of Ford automobiles, the Supreme Court thus succinctly summarized the rule (pages 59, 60 of 264 U. S., 44 S. Ct. 239, 241):

"By the contract Peck engaged to 'devote his time to the development of a process and machinery,' and was to receive therefor a stated compensation. Whose property was the 'process and machinery' to be when developed? The answer would seem to be inevitable and resistless—of him who engaged the services and paid for them, they being his inducement and compensation, they being not for temporary use, but perpetual use, a provision for a business, a facility in it, and an asset of it, therefore contributing to it whether retained or sold—the vendee (in this case the Standard Company) paying for it and getting the rights the vendor had (in this case the Axle Company).

"Other meaning to the contract would confuse the relation of the parties to it—take from the Axle Company the inducement the company had to make it—take from the company the advantage of its exclusive use and subject the company to the rivalry of competitors. And yet such, we think, is the contention of Peck. He seems somewhat absorbing in his assertion of rights. He yields to the Axle Company a shop right only, free from the payment of royalty, but personal and temporary—not one that could be assigned or transferred. Peck therefore virtually asserts, though stimulated to services by the Hess Company and paid for them, doing nothing more than he was engaged to

.lo and paid for doing, that the product of the services was so entirely his property that he might give as great a right to any. member of the mechanical world as to the one who engaged him and paid him—a right to be used in competition with the one who engaged him and paid him.

"We cannot assent to this, nor even to the limitation the Court of Appeals put upon Peck's contention. We concur with the District Court [295 F. 740], and therefore reverse the decree of the Circuit Court of Appeals [282 F. 443]."

From the findings of fact which we have made, there can be no doubt but that the status of the defendants, Dr. Cuno and Dr. Bashioum, is that of the employee defined in the second of the above classes. We have found that both, through their discoveries, did what they were employed to do. It is true that in the cases just cited, and in most, if not all, of the other decisions that lay down a similar rule, the employee was not, as in the present case, engaged primarily to examine and determine whether existing patented inventions belonging to others were commercially valuable, but rather to invent, himself, some particular thing or process, either ab initio or as an improvement upon existing inventions, which would be commercially valuable. But we consider, in so far as the application of the legal principle is concerned, that this is a distinction of form and not of substance. Surely an agreement to devote one's scientific knowledge and skill to a determination of whether a given article or process is commercially valuable, and to develop it to that end, impliedly includes an agreement to explain and to correct, if possible, its deficiencies, if any, in this respect. Conclusions without sound reasons in support of them are of little value in any realm of human activity. And so it is with improvements upon existing examples of inventive genius. Such improvements are but the tangible embodiment of the reasons for the advance in the given art. It is thus immaterial that, at the time defendants' services were engaged, no question as to the possibility of any patentable inventions being made by them in the course of their experiments and research had yet arisen.

The finding here made need not, however, be rested solely upon the above ground; because the same implication is inescapable by the very terms of the Kerns' agreements, which, as we have seen, must be taken as the starting point—as the basis—in determining the scope and intent of defendants' employment. By those agreements, the Kerns obligated themselves (1) to assign to the plaintiff or its assigns, or to the new corporation of its own creation, "complete title to any and all inventions of processes and (or) devices or articles, which they now have or which they may hereafter during the term of said agreement originate or invent or otherwise acquire, relating either directly or indirectly to the distillation or carbonization, or other production of any material or combinations of materials, carbonaceous or mineral, and (or) relating to any and all by-products resulting therefrom"; and (2) "immediately upon making any new discovery or invention relating to the subject matter of said agreement as amended hereby, to give full written information and description thereof to the second party [plaintiff], its assigns, or to the said corporation to be formed by second party, and to co-operate with second party whenever thereto requested, in applying for and obtaining letters patent on all inventions covered by said agreement as amended hereby and in causing title to such letters patent to be vested in second party, its assigns, or said new corporation." What was the express purpose of these obligations on the part of Kerns? Clearly to aid in the attainment of the primary object of the entire undertaking, as specifically stated in the second paragraph of the original agreement, that is, to afford to the Kerns, and through them to the plaintiff by virtue of its right to purchase, "a *patent monopoly* that will control the manufacture on a commercial scale of the said products and by-products." (Italics inserted.) If this be true, clearly these defendants, who were operating by virtue of, and with full knowledge of, the terms of the agreement with the Kerns, and were working with them to the same common end—all at the sole expense of the plaintiff—cannot be permitted successfully to assert, in the absence of proof of a very definite contrary agreement, that nevertheless they stand in a more preferred position with respect to what they themselves may have discovered in the course of a common enterprise, and may by such preference defeat the very object which they agreed to assist in attaining, and for which they accepted full compensation. Nor can we overlook the fact that these defendants, just before the rift in their relations with the plaintiff, had recommended to it the immediate expenditure of more than a half million dollars, and two millions more by the fall of 1931, for plant construction, etc.

Some analogy, if any further support be necessary for the conclusion here reached, is to be found in the firmly established doctrine

that one who has discovered a new principle in a machine or process does not lose his right as inventor to a patent therefor, because he elects to employ another to develop it and to put it into final workable shape, and who in the course of such employment discovers some changes or improvements. Agawam Woolen Co. v. Jordan, 7 Wall. 583, 19 L. Ed. 177; Minerals Separation, Ltd. v. Hyde, 242 U. S. 261, 37 S. Ct. 82, 61 L. Ed. 286; Larson v. Crowther (C. C. A.) 26 F. (2d) 780.

Counsel for defendants in their argument sought to draw an analogy between the employment here involved and the employment of one to mow or cut the grass on another's lawn, asserting that in the latter case it could not be successfully argued that, if in the course of such employment the employee conceived a mechanical improvement on the lawn mower which he used, such invention would belong to his employer. But this analogy is grossly imperfect, for, in the present case, the employment, by its defined scope and terms, of necessity implied the likelihood of dealing with improvements in the given art; whereas in the hypothetical case stated, the employee is engaged to do a very narrow, limited thing; namely, a piece of sheer, manual labor. Indeed, the two situations are devoid of any analogy, unless we suppose that in the hypothetical case the employee had been asked not merely to cut the grass, but in so doing to ascertain whether the lawn mower supplied by the employer for this purpose was, from a mechanical point of view, best adapted to accomplish this end.

In view of what has been said respecting the status of Dr. Cuno and Dr. Bashioum, it is unnecessary to say more with respect to the Bashioum Producer Retort Company than to point out that its rights respecting the inventions here in suit can obviously be no greater than those of the other defendants, because that company is in fact nothing more than these other defendants clothed in a corporate capacity.

Summarizing our conclusions, we find that the plaintiff has fully sustained the burden of proving all of the material allegations of the bill of complaint, and that therefore plaintiff is entitled to the relief for which it asks. Accordingly, a decree will be signed vesting in the plaintiff full and complete equitable title in and to all inventions originated or conceived by any of the defendants, individually or collectively, in the course of their employment by the plaintiff, and also granting to the plaintiff the permanent injunctive and other supplementary relief as prayed.