**CROWN CORK & SEAL CO., Inc., v. FANKHANEL.**

Civ. No. 1815.

District Court, D. Maryland.

March 24, 1943.

612

Hershey, Donaldson, Williams & Stanley and Roger A. Clapp, all of Baltimore, Md., and John J. Darby and C. Willard Hayes, both of Washington, D. C., for plaintiff.

Paul C. Wolman and Daniel S. Sullivan Jr., both of Baltimore, Md., for defendant.

WILLIAM C. COLEMAN, District Judge.

This is a suit to compel the defendant to execute an application for a patent covering an invention which he made for a substitute for rubber sealing compounds for use in caps on bottles, etc., while employed in the research department of the plaintiff company; and to compel the defendant to assign the invention and his application for a patent to the plaintiff company.

The jurisdictional requisites with respect to diversity of citizenship and amount in controversy are satisfied.

Summarized, we find the material facts as disclosed by the evidence in the case are as follows:

The plaintiff, a New York corporation with a large manufacturing plant and offices in Baltimore, has long been engaged in the manufacture and sale of so-called receptacle closures of various types of both metal and paper, such as pressed on caps or crown caps, used in sealing beverages under pressure as well as milk and other food products. Generally speaking, caps of such types are provided with a suitable sealing means to engage the lip of the bottle or other container and to provide against leakage of liquids or gases. Prior to the present war, in the case of pressed on caps, the sealing materials consisted of a rubber composition flowed into a groove or sealing surface, while in the case of crown caps, the sealing means had been of cork composition. The company maintains a research department employing a number of senior research scientists and their assistants for the purpose of improving the company's products, developing new products, methods and machines, and generally solving problems arising in the conduct of plaintiff's business with a view to keeping abreast of all progress in their trade and successfully meeting competition.

The defendant, now twenty-seven years old, a citizen of Maryland residing in Baltimore, was first employed by the plaintiff company in the summer of 1937 as a helper in the screw cap department, where plaintiff manufactures closures or tops of the screw type for bottles, etc. In the fall of the same year, he was transferred as a press operator to the so-called "Dactro" type closure department where the company manufactures composite metal and paper caps

for milk bottles. Defendant remained in this department until the fall of 1939, that is, for about two years, having been paid always at an hourly wage, the highest being 55¢ an hour. But in the fall of 1939 he was transferred to the company's research department as an assistant to Dr. Giles P. Cooke, senior member of the research staff, starting at a weekly salary of $22 which was gradually increased until about a year later, when he was given $32 a week, which was continued until he severed his connection with the company on January 19, 1942. Defendant's duties as assistant to Dr. Cooke consisted of conducting experiments and in working on research problems asigned to him by Dr. Cooke.

When defendant first came with the company, he was asked to execute, and did execute, a formal, written agreement with the company which reads as follows:

"In consideration of my employment and the salary paid to me by Crown Cork & Seal Company, Inc., I, James Walter Fankhanel, hereby agree that

"All inventions and discoveries which I make while in the employ of said Company, along the lines of its general work, constituting improvements both in its then existing products and methods of manufacture, or otherwise, shall become its exclusive property, that

"I will immediately upon conception of any and all such inventions and discoveries, disclose same to said Company and to no other person or persons; that

"Without further compensation—except such as said Company deems fit and proper in the premises, after Letters Patent have been obtained and said inventions or discoveries proven to be of value to it—I will, at the instance of said Company do all acts, sign and execute all applications and other papers necessary and incident to obtaining and maintaining in force, Letters Patent for any and all such inventions or discoveries both in the United States and countries foreign thereto; and that

"I will sign and execute all papers necessary to transfer and vest in said Company my entire right, title and interest in said inventions, discoveries and applications and in and to any and all Letters Patent obtained or to be obtained therefor, and will authorize the Commissioner of Patents to issue such patents to Crown Cork & Seal Company, Inc. as assignee thereof. The expenses incident to said inventions, discoveries, applications, Letters Patent and transfer to be borne by said Company."

It was the custom of the company to require a similar agreement from all its employees. Defendant came of age on January 8, 1938. He never disaffirmed this contract, and as already stated, continued as an employee of the company for more than four years after he became twenty-one.

During the summer of 1941, defendant was assigned to the work of aiding the research department in discovering and developing a substitute for sealing compounds having a rubber or latex base, because of the scarcity of rubber, due to the War. More specifically, the particular problem was how to keep the glue or sealing material fluid at normal room temperature while dispensing it in measured amount from a tank, and depositing it automatically upon the caps as they are consecutively positioned beneath the dispensing nozzle. As a result of his work, as disclosed by the entries in his own laboratory notebooks, defendant developed a sealing composition consisting of hide glue, water, nitric acid, glycerine and a curing agent which his superior, Dr. Cooke, believed to be a highly successful composition and recommended it for serious consideration and adoption by the company, which was shortly thereafter done.

The valuable discovery which it is conceded by the representatives of plaintiff company the defendant made in developing this new sealing composition, was the inclusion of nitric acid which kept the glue formula fluid at normal room temperature for some thirty hours,—a result which no one else had previously conceived could be accomplished through the use of nitric acid. Defendant maintains that he first conceived the idea of using nitric acid on October 25, 1941, but he claims that the discovery came to him in his laboratory in his own home, as a result of the examination of treatises which he obtained from the local public library and as a result of tests he made with various acids obtained from Johns Hopkins University Chemistry Department, he being enrolled as a night-school student in chemistry at that university during this period.

While defendant admits, as he has been compelled to do because the entries in his company laboratory notebooks are replete with data on the precise subject, that he worked on a rubber substitute as early as June, 1941, he, nevertheless, claims that he did so on "his own hook" in his spare time, and did not know that his superior, Dr. Cooke, or the company were, in fact, interested in developing such a substitute. The immediate cause of his leaving the company in January, 1942, was the company's refusal to grant him a requested increase in salary. He admits that shortly before he severed his connection with the company, he talked with one of the company's representatives about giving him a royalty on his invention, but he and the company agree that there was no mention made then, or in fact at any time while he was employed in the research department of the company, of the agreement which he had entered into, heretofore quoted, with respect to assigning to the company any of his inventions, etc.

For its part, the company maintains that defendant's discovery of the effective use of nitric acid occurred as a regular part of the work for which the defendant was at the time of his discovery employed by the company, and was not the result of what the defendant did on his own initiative or in his spare time, either inside or outside of the company's research laboratory.

Summarized, the two grounds upon which plaintiff bases the present suit are (1) that defendant was employed in the company's research department prior to and at the time when his invention was made; that defendant was assigned to the problem with which his invention was concerned, and was paid regular compensation for the very purpose of conducting experiments and developing the very invention which he did make; and (2) that the written agreement between the company and the defendant obligated defendant to assign to the company all inventions made during the period of his employment.

Pursuant to a stipulation filed after issuance of an order nisi for a preliminary injunction, defendant's application for a patent and an assignment to the company were executed by the defendant and filed in the United States Patent Office, the stipulation further providing that the company would reassign the invention to the defendant should it ultimately be determined, as a result of the present suit, that the company is not entitled to the patent.

Defendant's only defense to the first ground of action just stated is, as already pointed out, that he was not employed to make the invention. His defense to the second ground of action is that the contract is invalid and nonenforceable, because of a character detrimental to him, and because he was under twenty-one years of age when he executed it. The company's position with respect to this latter defense is that defendant ratified the contract by continuing in the plaintiff's employment and accepting the benefits of the contract after he became of age.

Defendant has also filed a counterclaim for wrongful use of his invention by the plaintiff in its business, and for an accounting of the profits which the plaintiff may have realized from sales involving the invention, unless it be determined that the plaintiff is entitled to a shop right or nonexclusive license to use the invention.

As to the first ground upon which plaintiff bases its suit, we are satisfied that the weight of the credible evidence amply supports it. In short, we find it inescapable from the statements of the defendant himself and from his own note-books, unless we refuse to draw from this evidence its necessary, reasonable implication, that the defendant, at the time he made his invention, was, in fact, assigned by the company to try to solve the very problem that he did solve. His note-books show that he worked during the months of June and July, 1941, alone, on as many as thirty-one separate days on the problem of finding a satisfactory sealing material devoid of latex. We are not warranted in a case of this kind in applying unreasonable refinements, or in construing the employment so narrowly as to say that, unless it is found that the particular chemical formula which the inventor used in making his discovery was given to him by his employer, the latter is not entitled to the fruits of the invention. We cannot believe the defendant when he says that he was not assigned by his superior, Dr. Cooke, to develop a satisfactory substitute material. Defendant's own note-books are a complete refutation of such a statement. It is true that he was not directed by Dr. Cooke to use this or that precise formula, —to include nitric or any other designated acid, but he was assigned to the very prob-

lem which his invention ultimately solved. The use of nitric acid in the formula first appears in defendant's note-book for October 27, 1941,—only two days later than the day on which he admits he discovered that nitric acid gave the desired results,—and this note-book is marked with the words "Research Laboratory" under defendant's name.

■ We believe that the present case falls within well-established principles which require us to decide that defendant's discovery belongs to the plaintiff. These principles have been clearly set forth by the Circuit Court of Appeals for this Circuit in Houghton v. United States, 23 F.2d 386. There, the employee was engaged as a research chemist in the Public Health Service of the Government, to conduct experiments for the purpose of combining a warning or irritant gas with hydrocyanic acid gas, used in fumigating vessels, so as to produce gas which could readily be detected and safely used as a fumigant. While so employed, he discovered that the desired result was obtainable by combining hydrocyanic acid gas and cyanogen chloride gas. This court, 20 F. 2d 434 (Judge Soper) held, and the Circuit Court of Appeals affirmed, that this invention was the property of the United States. In so deciding, the appellate court ruled that the same principle controlled whether the employer were a private individual or corporation or the Government, and laid down the rule as follows (page 390 of 23 F.2d):

"The right of the employer to the invention or discovery of the employee depends, not upon the terms of the original contract of hiring, but upon the nature of the service in which the employee is engaged at the time he makes the discovery or invention, and arises, not out of the terms of the contract of hiring, but out of the duty which the employee owes to his employer with respect to the service in which he is engaged. It matters not in what capacity the employee may originally have been hired, if he be set to experimenting with the view of making an invention, and accepts pay for such work, it is his duty to disclose to his employer what he discovers in making the experiments, and what he accomplishes by the experiments belongs to the employer. During the period that he is so engaged, he is 'employed to invent,' and the results of his efforts at invention belong to his employer in the same way as would the product of his efforts in any other direction.

\* \* \* \* \*

"What we deem to be the correct rule was well stated by Judge Soper in the court below as follows:

"'The broad principle is now laid down by the Supreme Court, too clearly to be misunderstood, that, when an employee merely does what he is hired to do, his successes, as well as failures, belong to his employer. Nor can it be said that one who willingly carries out the orders of his employer is not engaged upon that which he is employed to do. *An employee, who undertakes upon the direction of his employer to solve a specific problem within the scope of his general employment, is as truly employed and paid for the particular project as if it had been described at the outset in the contract of employment.'*" (Italics inserted.)

To like effect is a later decision of the Circuit Court of Appeals for this Circuit, Dinwiddie v. St. Louis & O'Fallon Coal Co., 64 F.2d 303, also affirming a decision of this court, 53 F.2d 655. There, a corporation made agreements with chemists for developing coal and its by-products under process of low distillation. These chemists agreed that if they made any new discovery or invention relating to the subject matter of their agreement, they would make full disclosure of and assign the same to the corporation. When, however, certain discoveries were made as a result of this employment, all expenses in connection with the research and experimental work which led up to the discoveries being borne by the corporation, the inventors claimed that the inventions belonged to them. In refusing, as this court had done, to agree with this view, the Circuit Court of Appeals said (page 306 of 64 F.2d):

"The principles of law controlling here are well settled. As was said by the judge below:

"'First, an invention made incidentally by an employee in the course of his regular or general employment, and at his employer's expense, is the property of the employee, unless he has agreed, either expressly or impliedly by virtue of some special terms of his employment, to transfer ownership to his employer; and, unless he has done so, the employer is at most entitled to a nonexclusive, nontransferable shop right, or irrevocable license to use

the invention. Hapgood v. Hewitt, 119 U. S. 226, 7 S.Ct. 193, 30 L.Ed. 369; Solomons v. United States, 137 U.S. 342, 11 S.Ct. 88, 34 L.Ed. 667; Dalzell v. Dueber Watch-Case Mfg. Co., 149 U.S. 315, 13 S.Ct. 886, 37 L.Ed. 749; Gill v. United States, 160 U.S. 426, 16 S.Ct. 322, 40 L. Ed. 480; Pressed Steel Car Co. v. Hansen [3 Cir.], 137 F. 403, 2 L.R.A.,N.S., 1172.

" 'Second, if, however, the employee is engaged to devise or to perfect a particular article or process, all discoveries made by him in connection therewith belong to the employer, since in making such discoveries the employee is merely doing what he was hired to do. Standard Parts Co. v. Peck, 264 U.S. 52, 44 S.Ct. 239, 68 L.Ed. 560, 32 A.L.R. 1033; Houghton v. United States [4 Cir.], 23 F.2d 386; Wireless Specialty Apparatus Co. v. Mica Condenser Co., Ltd., 239 Mass. 158, 131 N.E. 307, 16 A.L.R. 1170.'

"In Houghton v. United States, supra, will be found an able discussion by Judge Parker, of this court, of these principles and an exhaustive analysis of the authorities.

"In Standard Parts Co. v. Peck, supra, the Supreme Court said: 'By the contract Peck engaged to "devote his time to the development of a process and machinery," and was to receive therefor a stated compensation. Whose property was the "process and machinery" to be when developed? The answer would seem to be inevitable and resistless—of him who engaged the services and paid for them, they being his inducement and compensation, they being not for temporary use, but perpetual use, a provision for a business, a facility in it, and an asset of it, therefore contributing to it whether retained or sold— the vendee (in this case the Standard Company) paying for it and getting the rights the vendor had (in this case the Axle Company).'

"In Solomons v. United States, supra, Mr. Justice Brewer said: 'If one is employed to devise or perfect an instrument, or a means for accomplishing a prescribed result, he cannot, after successfully accomplishing the work for which he was employed, plead title thereto as against his employer. That which he has been employed and paid to accomplish becomes, when accomplished, the property of his employer. Whatever rights as an individual he may have had, in and to his in-

ventive powers, and that which they are able to accomplish, he has sold in advance to his employer.' "

In Standard Parts Co. v. Peck, 264 U.S. 52, 44 S.Ct. 239, 241, 68 L.Ed. 560, 32 A. L.R. 1033, from which the Appellate Court quoted as above, the employee, Peck, was employed by a company of which the Standard Parts Company was the successor, under a written agreement "to devote his time to the development of a process and machinery for the production of the front spring now used on the product of the Ford Motor Company." Peck proceeded under this contract and eventually developed and there were manufactured a series of machines which produced satisfactory springs. Peck obtained a patent on the invention, sued the company for alleged infringement, and the question of the ownership of the invention was thus raised. The District Court, 295 F. 740, held in favor of the company, the Circuit Court of Appeals, 6 Cir., 282 F. 443, reversed, but the Supreme Court concurred with the District Court. The Supreme Court said (pages 59, 60 of 264 U.S., page 241 of 44 S.Ct., 68 L.Ed. 560, 32 A.L.R. 1033) :

"It is going very far to say that the declaration of Solomons v. United States, repeated in subsequent cases, and apparently constituting their grounds of decision, may be put aside or underrated—assigned the inconsequence of dicta. It might be said that there is persuasion in the repetition. It cannot be contended that the invention of a specific thing cannot be made the subject of a bargain and pass in execution of it. And such, we think, was the object and effect of Peck's contract with the Hess-Pontiac Spring & Axle Company. That company had a want in its business—a 'problem' is Peck's word,—and he testified that 'Mr. Hess thought probably' that he (Peck) 'could be of some assistance to him (Hess) in working out' the 'problem,' and the 'thought' was natural. Hess had previous acquaintance with Peck, his inventive and other ability, and approached him, the result being the contract of August 23, 1915, the material parts of which are as follows: 'This agreement witnesseth that second party is to devote his time to the development of a process and machinery for the production of the front spring now used on the product of the Ford Motor Company. First party is to pay second party for such services the sum of $300 per month. That should said process and machinery be finished at or

before the expiration of four months from August 11, 1915, second party is to receive a bonus of $100 a month. That when finished second party is to receive a bonus of $10 for each per cent. of reduction from present direct labor, as disclosed by the books of first party.'

"By the contract Peck engaged to 'devote his time to the development of a process and machinery,' and was to receive therefor a stated compensation. Whose property was the 'process and machinery' to be when developed? The answer would seem to be inevitable and resistless—of him who engaged the services and paid for them, they being his inducement and compensation, they being not for temporary use, but perpetual use, a provision for a business, a facility in it, and an asset of it, therefore contributing to it whether retained or sold—the vendee (in this case the .Standard Company) paying for it and getting the rights the vendor had (in this case, the Axle Company).

"Other meaning to the contract would confuse the relation of the parties to it— take from the Axle Company the inducement the company had to make it—take from the company the advantage of its exclusive use and subject the company to the rivalry of competitors. And yet such, we think, is the contention of Peck. He seems somewhat absorbing in his assertion of rights. He yields to the Axle Company a shop right only, free from the payment of royalty, but personal and temporary— not one that could be assigned or transferred. Peck therefore virtually asserts, though stimulated to services by the Hess Company and paid for them, doing nothing more than he was engaged to do and paid for doing, that the product of the services was so entirely his property that he might give as great a right to any member of the mechanical world as to the one who engaged him and paid him—a right to be used in competition with the one who engaged him and paid him."

It is true that in Standard Parts Co. v. Peck, supra, unlike the situation in· the present case, the formal written agreement between employer and employee referred to the specific thing upon which the employee was to work, and also bonuses were provided for, based upon the success of the undertaking. However, there is nothing in the decision that indicates that the application of the principle which it lays down is dependent upon the existence of a specific formal written agreement. On the contrary, the rule favors the employer just as truly without as with such a formal contract, provided the employee merely does what he is hired to do.

There is nothing in United States v. Dubilier Condenser Corp., 289 U.S. 178, 53 S.Ct. 554, 77 L.Ed. 1114, 85 A.L.R. 1488, which modifies the principle announced in the earlier cases. In that case, scientists were employed by the Government in the radio section of the electric division of the Bureau of Standards. While so employed, they were assigned to research concerning use of radio in airplanes, but they made discoveries concerning the use of alternating current in broadcast receiving sets, a subject not within their assignment and not even under investigation by the radio section in which they were employed. Accordingly, the court held that there was no employment to invent and no basis for implying a contract to assign their inventions to the United States, or a trust in its favor save as to shop rights.

In this case, the Supreme Court reaffirmed the principle which it had repeatedly announced, saying (pages 187–189 of 289 U.S., page 557 of 53 S.Ct., 77 L.Ed. 1114, 85 A.L.R. 1488) :

"One employed to make an invention, who succeeds, during his term of service, in accomplishing that task, is bound to assign to his employer any patent obtained. The reason is that he has only produced that which he was employed to invent. His invention is the precise subject of the contract of employment. A term of the agreement necessarily is that what he is paid to produce belongs to his paymaster. Standard Parts Co. v. Peck, 264 U.S. 52, 44 S.Ct. 239, 68 L.Ed. 560, 32 A.L.R. 1033. On the other hand, if the employment be general, albeit it cover a field of labor and effort in the performance of which the employee conceived the invention for which he obtained a patent, the contract is not so broadly construed as to require an assignment of the patent. Hapgood v. Hewitt, 119 U.S. 226, 7 S.Ct. 193, 30 L.Ed. 369; Dalzell v. Dueber Watch Case Mfg. Co., 149 U.S. 315, 13 S.Ct. 886, 888, 37 L.Ed. 749. In the latter case it was said [149 U.S. page 320, 13 S.Ct. 886, 37 L.Ed. 749] :

" 'But a manufacturing corporation, which has employed a skilled workman, for a stated compensation, to take charge of its works, and ·to devote his time and services to devising and making improvements in articles there manufactured, is

not entitled to a conveyance of patents obtained for inventions made by him while so employed, in the absence of express agreement to that effect.'

"The reluctance of courts to imply or infer an agreement by the employee to assign his patent is due to a recognition of the peculiar nature of the act of invention, which consists neither in finding out the laws of nature, nor in fruitful research as to the operation of natural laws, but in discovering how those laws may be utilized or applied for some beneficial purpose, by a process, a device, or a machine. It is the result of an inventive act, the birth of an idea and its reduction to practice; the product of original thought; a concept demonstrated to be true by practical application or embodiment in tangible form. Clark Thread Co. v. Willimantic Linen Co., 140 U.S. 481, 489, 11 S.Ct. 846, 35 L.Ed. 521; Symington Co. v. National Castings Co., 250 U.S. 383, 386, 39 S.Ct. 542, 63 L.Ed. 1045; Pyrene Mfg. Co. v. Boyce [3 Cir.], 292 F. 480, 481.

"Though the mental concept is embodied or realized in a mechanism or a physical or chemical aggregate, the embodiment is not the invention and is not the subject of a patent. This distinction between the idea and its application in practice is, the basis of the rule that employment merely to design or to construct or to devise methods of manufacture is not the same as employment to invent. Recognition of the nature of the act of invention also defines the limits of the so-called shop right, which, shortly stated, is that, where a servant, during his hours of employment, working with his master's materials and appliances, conceives and perfects an invention for which he obtains a patent, he must accord his master a nonexclusive right to practice the invention. McClurg v. Kingsland, 1 How. 202, 11 L.Ed. 102; Solomons v. United States, 137 U.S. 342, 11 S.Ct. 88, 34 L.Ed. 667; Lane & Bodley Co. v. Locke, 150 U.S. 193, 14 S.Ct. 78, 37 L.Ed. 1049. That is an application of equitable principles. Since the servant uses his master's time, facilities, and materials to attain a concrete result, the latter is in equity entitled to use that which embodies his own property and to duplicate it as often as he may find occasion to employ similar appliances in his business. But the employer in such a case has no equity to demand a conveyance of the invention, which is the original conception of the employee alone, in which the employer had no part. This remains the property of him who conceived it, together with the right conferred by the patent, to exclude all others than the employer from the accruing benefits. These principles are settled as respects private employment."

Counsel for defendant have stressed such cases as Hapgood v. Hewitt, 119 U.S. 226, 7 S.Ct. 193, 30 L.Ed. 369, and Dalzell v. Dueber Watch-Case Mfg. Co., 149 U.S. 315, 13 S.Ct. 886, 37 L.Ed. 749, cited in the aforegoing quotation from the Dubilier case, as supporting defendant's present contention. In the first of these cases, the defendant was employed to devote his time and services to devising improvements in and getting up and perfecting ploughs adapted to the general trade of his company, of which he was vice-president and also superintendent of its manufacturing plant, at a salary of $3,000. At that time the company was manufacturing a plough known as a sulky or riding plough, so arranged that the plough was carried on a frame supported by wheels and so that the ploughman rode on the frame which was constructed of wood. The company desired a wrought and malleable iron frame substituted for the wooden one, and directed defendant to proceed to devise such an iron plough which he did, and it proved satisfactory to the company. After the company had been manufacturing and selling this new type of plough for some time, Hewitt left the company and applied for and obtained a patent covering certain parts of the new plough.

The company was later dissolved and its liquidating trustees sued Hewitt, claiming his invention belonged to the company and that, therefore, Hewitt was obligated to assign the patent to the company or its trustees. The lower (Circuit) court [11 F. 422] decided otherwise on a demurrer to the company's bill of complaint, holding that Hewitt was not expressly required by his contract to exercise his inventive faculties for the benefit of his employer, and that whatever right the latter had to the invention by the terms of Hewitt's contract of employment was a naked license to make and sell the patented improvement as a part of its business, which right, if it existed, was a mere personal one, not transferable and was extinguished with the dissolution of the corporation. The Supreme Court affirmed the Circuit Court on these precise grounds. It is to be noted that this case was never heard on the merits, but merely upon a demurrer as to

the sufficiency of the allegations of the bill of complaint. For aught that appears in the opinion, those allegations were drawn in reliance upon the actual contract between the parties, and the decree of the lower court, affirmed by the Supreme Court, was based upon a construction of that contract. Note the statement of the Supreme Court (page 233 of 119 U.S., page 197 of 7 S.Ct., 30 L.Ed. 369): "The utmost that can be made out of the allegations is that the corporation was to have a license or right to use the inventions in making ploughs. It is not averred that anything passed between the parties as to a patent. We are not referred to any case which sustains the view that, *on such facts as are alleged in the bill,* the title to the invention, or to a patent for it, passed." (Italics inserted.)

Thus while Hapgood v. Hewitt may, at first reading, appear to be contrary to other decisions, both earlier and later, of the Supreme Court, this is not actually the case, and certainly it can not be taken as controlling over, even if we assume it to be less clear than the later decisions.

In Dalzell v. Dueber Mfg. Co., supra, a watch case manufacturing company employed a skilled workman for a fixed compensation in its tool factory over a period of several years. After he left the company's employment, the company sought to compel him to assign his patented inventions on certain improvements in tools he had conceived while in the company's employment, relying upon an alleged oral agreement to do so. On the company's bill for specific performance, the Supreme Court found no such agreement to have existed. This was the sole question before the court, as is very clear from a reading of the opinion. All parties appear to have assumed that the terms of employment were too general, even though they covered a field of labor and effort in the performance of which the employee conceived the inventions, to permit their use as a basis for any claim that the employer was entitled to these inventions apart from an express contract to that effect.

The court construed its decision six years earlier in Hapgood v. Hewitt, supra, and cited it in support of the statement that "a manufacturing corporation which has employed a skilled workman, for a stated compensation, to take charge of its works, and to devote his time and services to devising and making improvements in articles there manufactured, is not entitled to a conveyance of patents obtained for inventions made by him while so employed, in the absence of express agreement to that effect," (page 320 of 149 U.S., page 888 of 13 S.Ct., 37 L.Ed. 749), thus, confirming, we think, the interpretation which we have heretofore given to this decision.

Since we conclude that the plaintiff must prevail in the present case, independently of the contract between it and the defendant, it is not necessary to consider the effect of that contract. However, we will briefly give our conclusion with respect to this phase of the case also. As already stated, defendant asserts that the contract is unenforceable because detrimental to him and made when he was still a minor, and that he has never ratified it but, on the contrary, now elects to avoid it as he has a right to do.

▇▇▇▇ It is true that the contract, which we have heretofore quoted in full, was entered into by the defendant when he was still under twenty-one years of age, and, therefore, was voidable within his discretion upon his reaching twenty-one, but not void per se. However, defendant remained for four years after he became of legal age in the employment of plaintiff and received the benefits of such employment without in any way renouncing or disaffirming the contract. We believe that such conduct amounts to a ratification of it. It is well settled that if an infant, after obtaining his majority, receives performance in whole or in part from the other party to a contract, he is considered in law to have ratified it. See Williston on Contracts, Revised Edition, Vol. 1, Section 239, page 707. Defendant, nevertheless, contends that the present contract was absolutely void, because, as he claims, it can not properly be regarded as in any sense beneficial to him.

▇▇▇▇ It is true that, in Maryland, if a contract, executed by a party when an infant, is not beneficial to him, such contract is not merely voidable but void ab initio. However, if the contract is of an uncertain nature as to benefit or prejudice, it is voidable only at the election of the infant. Fridge v. State, 3 Gill & J. 103, 20 Am.Dec. 463; Levering v. Heighe, 2 Md.Ch. 81.

The defendant relies upon such cases as Ridgeley v. Crandall, 4 Md. 435, and Monumental Building Association v. Herman, 33 Md. 128. However, those cases are not controlling here. In the first case, it was held merely that a husband could

not set up, as a defense to an action to recover money under division of real estate, that his wife, whom he had himself induced to become a party to the division, was a minor at the time she did so. In the second one, foreclosure under mortgages was involved, and there being no proof that the infants ever received any part of the money loaned, or that the mortgages were for their benefit, the sale was set aside.

In the present case, the contract which defendant made with the company cannot be said to have been necessarily to his prejudice. It is true, by this contract he assigned any fruits of his inventive genius, but on the other hand, by so doing he obtained employment which in and of itself was not a detriment but a benefit, and for aught that appears, at the time the contract was made and later, the very fact of defendant's employment under such contract might have led to relations with the company which might have proved very profitable through promotion, salary increases, etc., not to mention a possible readjustment of the agreement with respect to inventions. There was no duress or unfair advantage taken of the defendant. Requiring a contract such as this is usually done by employers in like circumstances. In one sense the rule is a hard one upon the employee. But the other aspect which cannot be ignored is that it is only through the opportunity for employment and research, all at the expense of the employer, and with the employer's guidance based on accumulated experience over the years, that the accomplishments of the employee are made possible. He is not enslaved to such employment, any more than he was bound to undertake it in the first place.

Such cases as Baltimore & Ohio R. R. Co. v. Duke, 38 App.D.C. 164, are not in point because they do no more than decide that, in construing contracts absolving common carriers from negligence in accordance with which an employee waives important rights, the construction to be adopted should be that which is liberal with respect to the employee especially where injury occurs to an employee while performing services not ordinarily contemplated or performed by him. In the present case, there is no limitation in the contract of employment respecting the kind of work in which defendant might be employed by plaintiff. There is no weight in the contention that it must be taken as having been impliedly terminated when plaintiff was moved out of the department in which he was first employed. Indeed, it is more reasonable to assume that the provisions of the contract related more directly to the work which the defendant ultimately did in the plaintiff's research department than that which he performed when initially employed, virtually as little more than a handyman, in the plaintiff's screw cap department. Furthermore, the situation involved in such cases as Baltimore & Ohio Railroad Company v. Duke, supra, are essentially different from that here presented. Here, there is no question of employer liability. It is a question of ownership of property rights.

Judgment must, therefore, be entered for the plaintiff on both the bill of complaint and the counterclaim, in accordance with this opinion, defendant to pay the costs.